Filed 6/21/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOSEPH HUSMAN, | B268300 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC523358) |
| v. | |
| TOYOTA MOTOR CREDIT CORPORATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly E. Kendig, Judge.  Reversed and remanded.

Barrera & Associates and Patricio T.D. Barrera for Plaintiff and Appellant.

Paul Hastings, James A. Zapp, Paul W. Cane, Jr. and Felicia A. Davis, for Defendant and Respondent.

————————————————

Joseph Husman, a 14-year employee of various Toyota divisions at its Torrance campus in southern California, ran the diversity and inclusion program for Toyota Financial Services U.S.A., the brand name for Toyota Motor Credit Corporation (TFS or Toyota). Following his termination in 2011, Husman sued Toyota for discrimination and retaliation in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.),[1] as well as for wrongful discharge, alleging he had been fired from his executive-level management position because of his sexual orientation and criticisms he made concerning Toyota's commitment to diversity. The trial granted Toyota's motion for summary judgment and entered judgment in its favor. Because Husman presented sufficient evidence a substantial motivating factor for his termination was invidious sex or gender stereotyping related to his sexual orientation—the perception he was "too gay"—we reverse the judgment. However, Husman failed to raise a triable issue of material fact to support his FEHA retaliation and related common law tort claim. Accordingly, on remand the trial court is to enter an order granting Toyota's alternative motion for summary adjudication as to those two causes of action.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Husman's Advancement at Toyota*

Husman was hired by Toyota in April 1997 and, except for a brief period in 2000, worked in various management-level positions in Toyota's marketing, sales and financial services divisions until his 2011 termination. In 2007 George Borst, the chief executive officer of TFS, decided to create a new

---

[1]     Statutory references are to this code unless otherwise stated.

management position to enhance Toyota's diversity outreach under the supervision of Julia Wada, TFS's vice president for human resources, who was then Husman's supervisor.  When Wada's initial efforts to identify a candidate were unsuccessful, Borst suggested she consider Husman, whom he knew and liked.[2]  Borst and Wada knew Husman was gay and had, as Borst put it, "a passion for diversity."  Borst harbored some concern about Husman's reputation for gossiping, but Wada assured Borst she could manage him.  Shortly thereafter, Wada selected Husman as TFS's first national manager for diversity and inclusion.  He continued to report to Wada.

By all accounts Husman excelled at important components of his job.  He successfully implemented a diversity training program for TFS.  During his tenure Toyota was recognized as one of the top 50 companies for diversity by Diversity, Inc. and, beginning in 2009, received a perfect score on the Human Rights Campaign's corporate equality index gauging corporate support of lesbian, gay, bisexual and transgender (LGBT) rights.[3]  Toyota also sponsored many national- and community-based

---

[2]  In 2001 Borst married another Toyota employee who was a colleague and friend of Husman.  Husman socialized occasionally with Borst and his wife and attended their wedding in Italy.

[3]  Borst had a history of supporting LGBT rights.  He had attended several LGBT events with Husman and successfully pushed TFS to provide medical benefits to same-sex domestic partners before California adopted legislation requiring such coverage in 2004.  (See Stats. 2004, ch. 488, § 4, pp. 4008-4009, amending Ins. Code, § 10121.7.)  He also successfully advocated for the Toyota companies to extend medical benefits to cover gender-reassignment surgery in 2010.

philanthropic events, including AIDS Walk LA. Husman's performance was rated as "very good" on annual performance reviews (4 on a scale of 1 to 5), and he received significant annual bonuses. In March 2010 the TFS management committee rewarded him with an "Extraordinary Performance Award," in recognition of what Borst described as "put[ting] D[iversity] and I[nclusion] on the map at TFS." In thanking Borst, Wada and David Pelliccioni, TFS's chief administrative officer and senior vice president of sales, marketing and operations, for the award, Husman also thanked them "for all you have each done to personally support my efforts at TFS . . . ."

Notwithstanding Husman's impressive employment reviews, Wada believed his internal performance could be improved and counseled him to develop stronger relationships with executive leaders to demonstrate the value of his programs and secure their continued support. She also counseled him on two occasions about leadership role modeling: once, after another manager heard him make disparaging comments about a Toyota executive, and again after he told a self-deprecating joke that made another employee feel uncomfortable.

2. *Husman's Promotion to an Executive-level Position*

These complaints did not impede Husman's career advancement. In August 2010 he was promoted to an executive-level position as the corporate manager of corporate social responsibility, again with Borst's backing. His duties encompassed TFS's efforts in the areas of diversity and inclusion, as well as corporate philanthropy. In his new capacity he reported to Ann Bybee, TFS's vice president for corporate strategy, communications and community relations. Bybee, in turn, reported to Pelliccioni. Like Wada and Borst, Bybee and

4

Pelliccioni had known Husman for more than a decade and knew he identified as gay. Bybee considered him a friend and had no reservations about his promotion. Pelliccioni later stated he had doubts about Husman's promotion but did not express them at the time in light of Borst's support.

In early 2011 Bybee began to have concerns about Husman's frequent absences from the office and lax management of his team. She counseled him to adjust his schedule to allow more time in the office. Soon thereafter, Bybee learned from Tess Elconin, a human resources manager, of several complaints stemming from inappropriate comments Husman had allegedly made to his coworkers. After a three-week investigation Bybee and Elconin concluded, having corroborated the allegations with at least two sources, that Husman told an applicant for a posted job who had just returned from pregnancy leave that she was "on the mommy track"; instructed his team not to use sports analogies when explaining concepts to women because they would respond better to cooking or gardening analogies; declared the area near his office to be a "Republican Free Zone"; told another woman who recently had a baby that her life was now over; commented on the physical attributes of other employees, referring to them as "short and stocky," "always having plates of food," "too skinny" and "wasting away"; and disparaged executives as "pleated pants."[4]

In April 2011 Bybee and Elconin advised Husman of the results of the investigation and told him he would receive a written warning, certain reduced performance ratings and,

---

[4] Husman denied making some of these comments and admitted making others, but said they had been taken out of context or were not offensive.

consequently, a slightly lower bonus. Because Husman was out of the office the rest of the month, he was not presented with the warning until May 2011. Upset, he refused to sign the warning letter and attempted to negotiate its wording, which had already been reviewed by Borst and Pelliccioni.[5] Bybee made some minor edits to the letter, but Husman still refused to sign.

After receiving the warning Husman became increasingly uncooperative with Bybee, who requested that Pelliccioni intervene. When Pelliccioni asked to meet with Husman in June 2011, Husman initially declined the meeting. Pelliccioni told him the meeting was not optional. Husman finally met with Bybee and Pelliccioni on June 23, 2011. During the meeting Pelliccioni

---

[5] Bybee's letter stated, "With your promotion to Corporate Manager, and your previous role as National Manager, Diversity and Inclusion, my expectation was that you would be the role model for inclusive behavior. I recently became aware of conduct that did not meet that expectation. As we discussed, you made multiple comments that offended your co-workers and displayed insensitivity to the unique qualities that everyone brings to the table. My concerns were compounded by your initial inability to grasp the seriousness of the concerns or to take responsibility for your conduct. [¶] . . . [¶] As a Corporate Manager, you are expected to exercise sound judgment and demonstrate leadership at all times, and as the leader of our Diversity and Inclusion efforts, you are expected to bring associates together in a collaborative manner and use inclusive efforts to challenge us and lead us. After having discussed our expectations for leaders and the significance of your behavior in this matter, I am confident that you understand the importance of creating a welcoming environment and appreciating what everyone brings to the table. I'm equally confident that you understand that the non-inclusive conduct we've discussed will not be repeated."

informed Husman the company wanted him to succeed and offered to hire an executive coach to assist him in meeting their expectations, a strategy Toyota had successfully utilized in the past.  In a private meeting with Pelliccioni later that day, Husman expressed his frustration and anger with the disciplinary measures, which he felt were unfair.  At some point in these meetings Husman told Pelliccioni he felt Toyota was not supporting the diversity and inclusion program and did not grasp what Husman was trying to do.

Although Borst and Pelliccioni later stated they had no thoughts of terminating Husman in June 2011, an episode at a diversity awards dinner earlier that month had further alienated Husman.  In the fall of 2010 Husman had submitted an application nominating Borst for a corporate leadership award from Diversity Best Practices, Inc.  Borst was selected as a recipient of the award, which was conferred at a dinner in New York in early June 2011.  In what he later characterized as a joke, Borst said in accepting the award that his goal was to fire Husman.  He explained that in the future he hoped a diversity and inclusion program would no longer be necessary at Toyota.  Husman believed Borst was mocking him and did not truly care about the issue of diversity.

Husman's frustration also stemmed from his belief other Toyota executives, including Borst and Pelliccioni, had not been disciplined for comments about employees far worse than those for which he had been disciplined.  Pelliccioni had also made comments Husman perceived as anti-gay, observing that Husman made "a very clear statement" about his sexual orientation and

7

should cut his hair and ridiculing him for wearing a scarf as an accessory when it was not cold outside. Husman complained about these comments to Wada and Bybee; but they declined to correct Pelliccioni, who was their boss.

Husman also believed Pelliccioni paid only lip service to Toyota's sponsorship of events like AIDS Walk LA but did not participate in a meaningful way. When Husman asked Pelliccioni to include AIDS Walk LA on the list of organizations eligible for automatic payroll deductions, Pelliccioni refused on the ground the list was restricted to national organizations. Pelliccioni was aware Husman complained about this decision to Vincent Bray, another executive involved in approving the list. In August 2011 Husman also expressed his frustration with what he perceived as Toyota's lack of progress in supporting its LGBT employees to the company's Diversity Advisory Board, which was comprised of prominent national figures. Asked by one board member about the state of affairs for Toyota's LGBT employees, Husman answered that Toyota had made some progress but had a long way to go, a statement he believed caused Borst to treat him coldly.

Bybee in turn became increasingly frustrated with what she perceived as Husman's insubordination and his lack of progress on assigned tasks.[6] During the summer he failed to implement

---

[6]   Bybee had earlier asked Husman to prepare a three-year roadmap for diversity and inclusion goals. As part of that request Bybee asked Husman to evaluate the outside relationships he should develop and, based on that evaluation, winnow the number of conferences he attended to reduce his travel. Husman resisted producing the plan and eventually gave Bybee a list of conferences she felt had been thrown together without much thought. In another instance, an executive training program scheduled for June 2011 had to be postponed because Husman and his staff

8

Pelliccioni's offer of an executive coach.  He continued to be frequently absent from the office and avoided meetings with Bybee.  When she asked him to spend more time in the office with his staff and key executives, he told her she was lucky he came into the office at all because of the negative atmosphere.  He also referred to her as "low context," a term Bybee believed he used in a derogatory manner.  When she scheduled a team-building exercise intended to help him strengthen his relationships with his peers, he emailed his response as "tentative," even though she had checked his calendar and knew he was free on the scheduled date.

### 3. *Husman's Termination*

In mid-September 2011 Husman failed to attend two one-on-one meetings with Bybee and resisted attending an executive conference scheduled for September 19, 2011.  On September 15, 2011 the executive group (including Husman) received scores from a cultural literacy test administered by a consultant.  Husman received the highest score and, referring to the March 2011 investigation, told Bybee he was angry that others who had scored lower had been judging him.  Bybee believed this statement revealed Husman had "taken no step forward" after the multiple efforts to assist him.  When Borst dropped by her office later that day, she told him she was "at wit's end" and no longer wanted to

---

failed to prepare the necessary materials.  Even with an extra month for preparation, the materials were not timely delivered; and Borst, who was scheduled to deliver the opening remarks, did not receive them until shortly before the opening session.

work with Husman. Later that day, Pelliccioni called her and said, "We're done with Joe."[7]

Describing the same events, Borst stated he too had been disturbed by Husman's behavior following the warning letter and viewed Husman's comment to Bybee criticizing those who had scored lower on the cultural literacy test as "the straw that broke the camel's back." Borst testified he made the decision to terminate Husman after he left Bybee's office and called Pelliccioni from his car to tell him of his decision. He instructed Pelliccioni to provide a generous separation package to allow Husman to leave with dignity. Pelliccioni then called Bybee to pass along those instructions. Pelliccioni told the consultant investigating the termination he did not initiate Husman's termination but was involved in numerous discussions with Bybee, Borst, Wada and members of the legal team about it. According to Pelliccioni, everyone supported the decision.

Bybee delivered the message in a telephone call to Husman on the following Sunday, September 18, 2011. Bybee and Husman agree she told Husman he was being terminated for "excluding the majority." Husman claims she also told him he was focusing too much on LGBT issues, a comment he understood as a reaction

---

[7]     As reported by the consultant who investigated Husman's termination, Bybee told a slightly different version of these events. She had kept Borst informed about her difficulties managing Husman; and, months earlier, he had suggested she consider a separation package for Husman. Now, he told her to talk with in-house legal counsel, a response she understood as an endorsement of Husman's termination. Bybee then informed Pelliccioni of her decision, who told her she should not "back-track" on it.

to his complaint about Pelliccioni's refusal to add AIDS Walk LA to the list of payroll deductions available for charitable gifts by employees and his statement to the Diversity Advisory Board pointing out Toyota's inadequate progress in addressing the issues of LGBT employees.  Bybee explained she meant that Husman's job required him "to raise awareness of diversity and inclusion issues within the company" and obtain support, or buy-in, throughout the company for those issues.

According to Husman, Bybee also told him she was terminating him at the request of Pelliccioni, "who had it out for him," and suggested he ask Borst for reconsideration of the decision.  Husman texted Borst that evening, apologized for disappointing him, and asked whether the decision could be turned into a "wakeup call" to better his performance.  When Borst confirmed the decision, Husman thanked him for all he had done for him over the years and asked if Borst would provide career advice once the dust had settled.

In a conference call the next day, Elconin, Bybee and general counsel Katherine Adkins proposed a severance agreement allowing Husman to remain on paid administrative leave until November 2, 2011 while the parties negotiated other terms of the agreement.  Husman never returned to work, and his duties were assigned to two people:  Mark Simmons, who is not gay, was assigned Husman's corporate philanthropy duties; his diversity and inclusion responsibilities were assigned to Stephen Lewis, a gay man.

4. *Husman Alleges He Was Terminated Because of His Sexual Orientation*

On September 23, 2011 Husman's lawyer informed Toyota by email that his client had been subjected to sexual orientation

discrimination. After an unsuccessful mediation, Husman also alleged Toyota had retaliated against him.[8]

Husman sued Toyota on October 3, 2013 alleging sexual orientation discrimination and retaliation under FEHA. He also alleged two common law claims for wrongful termination in violation of public policy paralleling the FEHA claims. Toyota moved for summary judgment on January 8, 2015. At the hearing on March 25, 2015 the court issued a tentative ruling that Husman had raised a triable issue of material fact precluding summary judgment. After a lengthy argument and supplemental briefing, the court issued a final decision granting the motion. Judgment was entered against Husman on October 5, 2015, following an unsuccessful motion for reconsideration.

## DISCUSSION

1. *Standard of Review*

A motion for summary judgment or summary adjudication is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment or summary adjudication de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party or a determination a cause of action has no merit as a matter of law. (*Hartford*

---

[8]     Toyota commenced an internal investigation into Husman's charges and invited him to be interviewed. He declined. The investigation was conducted by a third party who ultimately concluded Husman had been terminated for nondiscriminatory reasons related to his performance.

*Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618; *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 582 (*Soria*).)  The evidence must be viewed in the light most favorable to the nonmoving party.  (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 703; *Schachter*, at p. 618.)

When a defendant moves for summary judgment in a situation in which the plaintiff would have the burden of proof at trial by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action.  Alternatively, the defendant may present evidence to "'show[] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; see Code Civ. Proc., § 437c, subd. (p)(2).)  "'"'The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish,"' the elements of his or  her cause of action."'"  (*Ennabe v. Manosa*, *supra*, 58 Cal.4th at p. 705; accord, *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; *Soria, supra,* 5 Cal.App.5th at p. 582.)

Once the defendant's initial burden has been met, the burden shifts to the plaintiff to demonstrate, by reference to specific facts, not just allegations in the pleadings, there is a triable issue of material fact as to the cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850.)  On appeal from an order granting summary judgment, "a reviewing court must examine the evidence de novo and *should draw reasonable inferences* in favor of the nonmoving party."  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470; accord, *Aguilar*, at p. 843.)  "[S]ummary judgment

13

cannot be granted when the facts are susceptible to more than one reasonable inference . . . ." (*Rosas v. BASF Corp.* (2015) 236 Cal.App.4th 1378, 1392; accord, *Soria, supra,* 5 Cal.App.5th at p. 582.)

2. *Analyzing Discrimination Claims Under FEHA*

FEHA prohibits an employer from, among other things, discharging a person from employment because of his or her gender, gender identity, gender expression or sexual orientation. (§ 12940, subd. (a).) The express purposes of FEHA are "to provide effective remedies that will both prevent and deter unlawful employment practices and redress the adverse effects of those practices on aggrieved persons." (§ 12920.5.) The Legislature accordingly has mandated that the provisions of the statute "shall be construed liberally" to accomplish its purposes. (§ 12993, subd. (a).) As the Supreme Court has recognized, "[b]ecause the FEHA is remedial legislation, which declares '[t]he opportunity to seek, obtain and hold employment without discrimination' to be a civil right [citation], and expresses a legislative policy that it is necessary to protect and safeguard that right [citation], the court must construe the FEHA broadly, not . . . restrictively." (*Robinson v. Fair Employment & Housing Com.* (1992) 2 Cal.4th 226, 243; accord, *Soria, supra,* 5 Cal.App.5th at p. 583.)

a. *The McDonnell Douglas burden-shifting test*

In analyzing claims of discrimination under FEHA, California courts have long used the three-stage burden-shifting approach established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (*McDonnell Douglas*) for the analysis of title VII (42 U.S.C. § 2000e et seq.) employment discrimination

14

claims. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2 (*Reid*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 ["[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes"].) The *McDonnell Douglas* test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz,* at p. 354; accord, *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860.)

Under the *McDonnell Douglas* test a plaintiff may establish a prima facie case for unlawful discrimination by providing evidence that "(1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he [or she] sought or was performing competently in the position he [or she] held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some circumstance suggests discriminatory motive." (*Guz, supra,* 24 Cal.4th at p. 355; *Soria, supra,* 5 Cal.App.5th at pp. 583-584.) "Once the employee satisfies this burden, there is a presumption of discrimination, and the burden then shifts to the employer to show that its action was motivated by legitimate, nondiscriminatory reasons. [Citation.] A reason is "'legitimate'" if it is 'facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination.' [Citation.] If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce

other evidence of intentional discrimination." (*Reid, supra,* 50 Cal.4th at p. 520, fn. 2, italics omitted.)

In the context of summary judgment an employer may satisfy its initial burden of proving a cause of action has no merit by showing either that one or more elements of the prima facie case "is lacking, or that the adverse employment action was based on legitimate nondiscriminatory factors." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038; see *Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at pp. 356-357; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 150.) "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz,* at p. 361; see also *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097-1098 [if a defendant employer's motion for summary judgment "relies in whole or in part on a showing of nondiscriminatory reasons for the [adverse employment action], the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the [adverse action]. [Citations.] To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred"].) "'Circumstantial evidence of "'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate" on an improper basis.'" (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834.)

16

b. *Mixed-motive analysis under* <u>Harris v. City of Santa Monica</u>

In some cases there is no single reason for an employer's adverse action, and a discriminatory motive may have influenced otherwise legitimate reasons for the employment decision. In *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*) the California Supreme Court recognized the traditional *McDonnell Douglas* burden-shifting test was intended for use in cases presenting a single motive for the adverse action, that is, in "cases that do not involve mixed motives." (*Id.* at p. 214.) As the Court explained, this "framework . . . presupposes that the employer has a single reason for taking an adverse action against the employee and that the reason is either discriminatory or legitimate. By hinging liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the 'true' reason for the employer's action. In a mixed-motives case, however, there is no single 'true' reason for the employer's action." (*Id.* at p. 215.)

To resolve the proper legal analysis in a mixed-motive case under FEHA, the Court invoked the United States Supreme Court's decision in *Price Waterhouse v. Hopkins* (1989) 490 U.S. 228 [109 S.Ct. 1775, 104 L.Ed.2d 268] (*Price Waterhouse*) and subsequent amendments to title VII, as well as the legislative intent behind FEHA's use of the language "because of." In *Price Waterhouse* the female plaintiff, a senior manager at an accounting firm, was described as "macho" and "masculine" and informed that "to improve her chances for partnership, . . . [she] should 'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" (*Price Waterhouse*, at pp. 231-232, 235). After her office

17

declined to nominate her for partnership, she sued under title VII alleging sex discrimination. (*Price Waterhouse*, at pp. 231-233.) Six members of the Supreme Court held that an adverse employment action rooted in "sex stereotyping" or "gender stereotyping" was actionable sex discrimination even though the defendant purported to offer a legitimate reason—Hopkins's poor interpersonal skills—for the adverse action. (*Id.* at pp. 250-252 (plurality); see also *id.* at p. 258 (White, J., concurring); *id.* at pp. 272-273 (O'Connor, J., concurring).) As Justice Liu summarized for the California Supreme Court in *Harris*, "[t]he principal debate in *Price Waterhouse* concerned the 'allocation of the burden of persuasion on the issue of causation.' [Citation.] The high court rejected the view that a title VII plaintiff has the burden of proving 'but for' causation. Instead, the court held that once the plaintiff shows that discrimination was a motivating factor, the burden shifts to the defendant to negate 'but for' causation by proving that it would have made the same decision at the time even without the discrimination." (*Harris, supra,* 56 Cal.4th at p. 219.) "Under *Price Waterhouse*, such a showing by the employer is a complete defense to liability." (*Ibid.*)[9]

---

[9]	Justice O'Connor, concurring in the result in *Price Waterhouse*, insisted a plaintiff should be required to establish a discriminatory motive through direct, rather than circumstantial, evidence. The Supreme Court rejected that position in *Desert Palace, Inc. v. Costa* (2003) 539 U.S. 90, 99-100 [123 S.Ct. 2148, 156 L.Ed.2d 84].) The California Supreme Court agreed in *Harris*: "[T]he law generally makes no distinction between circumstantial and direct evidence absent some affirmative indication in a statute and that both types of evidence can be persuasive in discrimination cases." (*Harris, supra,* 56 Cal.4th at p. 232.)

18

Two years after the decision in *Price Waterhouse*, Congress confirmed the Supreme Court's interpretation of title VII by amending the law to provide that "an unlawful employment practice was established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for an employment practice, even though other factors also motivated the practice." (42 U.S.C. § 2000e-2(m); see *Harris, supra,* 56 Cal.4th at p. 219.) Congress rejected, however, the Supreme Court's holding an employer's same-decision showing would constitute a complete defense to liability: "[W]hen an individual 'proves a violation' of Title VII and the employer shows it 'would have taken the same action in the absence of the impermissible motivating factor,' a court can "grant declaratory relief, injunctive relief . . . , and attorney's fees and costs' directly attributable to the Title VII claim but 'shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment. . . .'" (*Harris,* at p. 220, quoting 42 U.S.C. § 2000e-5(g)(2)(B).)

After summarizing *Price* Waterhouse and the congressional response to it, the *Harris* Court turned to the issue of causation under FEHA. The Court analyzed legislative intent for the term "because of" (and its corollary "but for") and concluded the Legislature intended California workplaces to be free from prohibited discrimination even if the employer acted in part with a legitimate purpose for the adverse action. (*Harris, supra,* 56 Cal.4th at pp. 223-224.) Considering whether a plaintiff should be entitled to any relief when the employer demonstrates it would have made the same decision in any event, the Court observed the Fair Employment and Housing Commission had interpreted section 12940, subdivision (a), to impose liability "when 'a

19

preponderance of all the evidence demonstrates that the adverse employment action was caused at least in part by a discriminatory motive'" and not to absolve an employer of complete liability when it demonstrated it would have reached the same decision absent the discriminatory motive. (*Harris,* at pp. 224-225.)

In light of the not infrequent occurrence of mixed motives in discrimination cases, particularly as exemplified by *Price Waterhouse*, and FEHA's goal of eradicating discrimination from the workplace, the Court concluded an employer's same-decision showing should not be a complete defense to liability:[10] "[T]o say that discrimination was not the 'but for' cause of an employment decision is not to say that discrimination played an insignificant role or that it necessarily played a lesser role than other, nondiscriminatory factors. . . . [I]t is important to recognize that discrimination can be serious, consequential, and even by itself determinative of an employment decision without also being a 'but for' cause. [¶] We believe that allowing a same-decision showing to immunize the employer from liability in circumstances like those facing Ann Hopkins . . . would tend to defeat the purposes of the FEHA. Whether or not an employee in [her] respective position[] would have been promoted in any event, the existence of

_____

[10] *Harris* held, if a plaintiff has shown by a preponderance of the evidence that discrimination was a substantial factor motivating his or her termination and the employer then demonstrates that legitimate, nondiscriminatory reasons would have led it to the make the same decision at the time, "then the plaintiff cannot be awarded damages, backpay, or an order of reinstatement. However, where appropriate, the plaintiff may be entitled to declaratory or injunctive relief. The plaintiff also may be eligible for an award of reasonable attorney's fees and costs . . . ." (*Harris, supra,* 56 Cal.4th at p. 241.)

facts from which a jury could find that improper bias was a substantial factor motivating the employer's decision is sufficient to establish discriminatory conduct that 'foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general.' (§ 12920.) Such discrimination, even if not a 'but for' cause of the disputed employment action, would breed discord and resentment in the workplace if allowed to be committed with impunity." (*Harris, supra*, 56 Cal.4th at pp. 229-230.)[11]

While *Harris* concerned an appeal from a jury verdict in favor of a city bus driver who had claimed she was fired because of

---

[11]     Underlying *Harris* is a concern for what has been called second generation discrimination, that is, discrimination against individuals based on invidious stereotypes about the particular group to which they belong or structural biases that motivate employers' decisions independently of their conscious judgment that discrimination against those groups is inappropriate. (See Sturm, *Second Generation Employment Discrimination:  A Structural Approach* (2001) 101 Colum. L.Rev. 458; *Harris*, *supra*, 56 Cal.4th at p. 230 ["[a] company's practice of sex stereotyping or a supervisor's refusal to promote 'another woman' may not be determinative for a particular job applicant, but it may be determinative for a future applicant if left unsanctioned"].)  As one commentator put it, "Punishing only employers who discriminate against an entire class, and not just against individuals who exhibit behaviors associated with that class, allows employers to continue evaluating workers according to bigoted criteria." (Herz, <u>*Price's Progress:  Sex Stereotyping and Its Potential for Antidiscrimination Law*</u> (2014) 124 Yale L.J. 396, 434.)

her pregnancy, its mixed-motive analysis translates readily to the summary judgment context. Although we have found no published California decision relying on *Harris's* mixed-motive analysis for review of a summary judgment, numerous federal courts have adapted *Price Waterhouse'*s analysis for review of orders granting summary judgment. An Eleventh Circuit decision recently surveyed other circuit decisions and found the Eighth Circuit to be the only one requiring plaintiffs to adhere to the *McDonnell Douglas* burden-shifting framework in mixed-motive cases. (See *Quigg v. Thomas County School District* (11th Cir. 2016) 814 F.3d 1227, 1237-1239; see also Comment, *Mixed Motives and Motivating Factors: Choosing a Realistic Summary Judgment Framework for § 2000e-2(m) of Title VII* (2010) 54 St. Louis U. L.J. 1439.) As described in *Quigg*, the mixed-motive framework for summary judgment "requires a court to ask only whether a plaintiff has offered 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action.'" (*Quigg*, at p. 1239; compare *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 111, fn. 11 ["Plaintiff has not invoked the competing model of ""mixed motive"" analysis, under which a case goes to the jury if there is evidence that an impermissible criterion ""was a motivating factor for any employment practice."" [Citations.] This model presents its own perplexities . . . but has the virtue of a more direct and logical method for the assessment of conflicting proofs of motive than has developed under what Judge Posner calls 'the *McDonnell Douglas* quadrille.'"].)

Ultimately, courts have recognized that whether a court applies the *McDonnell Douglas* framework or the mixed-motive

22

analysis described in *Quigg*, the relevant inquiry devolves to a showing of some discriminatory animus. (See, e.g., *McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, 1122 [employees may survive a motion for summary judgment through the *McDonnell Douglas* framework or by simply showing a genuine issue of material fact exists as to whether an illegal reason was a motivating factor in an adverse action]; *Diamond v. Colonial Life & Accident Ins. Co.* (4th Cir. 2005) 416 F.3d 310, 318 [same]; *Hossack v. Floor Covering Assocs. of Joliet, Inc.* (7th Cir. 2007) 492 F.3d 853, 860-862 [same].)

In short, when an employee fails to establish pretext, evidence of discriminatory animus is the sine qua non of a discrimination claim. Moreover, *Harris* tells us "there must be a causal link between the employer's consideration of a protected characteristic and the action taken by the employer" and a plaintiff must demonstrate "discrimination was a *substantial* motivating factor, rather than simply *a* motivating factor." (*Harris, supra,* 56 Cal.4th at pp. 215, 232; accord, *Soria, supra,* 5 Cal.App.5th at p. 590; see *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551 ["[P]roof of discriminatory animus does not end the analysis of a discrimination claim. There must also be evidence of a causal relationship between the animus and the adverse employment action."].) If triable issues of material fact exist whether discrimination was a substantial motivating reason for the employer's adverse employment action, even if the employer's professed legitimate reason has not been disputed, the FEHA claim is not properly resolved on summary judgment.

3. *Toyota Established a Legitimate Nondiscriminatory Reason for Husman's Termination, but Husman Also Raised a Triable Issue of Fact as to Whether His Termination Was Substantially Motivated by Discriminatory Bias*

The summary judgment record plainly demonstrates Toyota had a legitimate, nondiscriminatory reason for discharging Husman that was nonpretextual. Toyota established that by September 15, 2011 Bybee had become so frustrated by Husman's absences from the office and his insubordinate behavior, she no longer wanted to manage him. According to Toyota, her dissatisfaction with Husman's performance, which she expressed to Borst on the afternoon of September 15, 2011, led Borst to decide to terminate Husman, a decision he relayed to Pelliccioni who in turn informed Bybee.[12] Under *McDonnell Douglas* and *Harris*, therefore, the burden of persuasion shifted back to Husman to show his termination was also substantially motivated by impermissible bias. Husman satisfied that burden: The evidence before the court is susceptible to reasonable inferences that discriminatory animus—a dislike for Husman's being "too gay"—also contributed to Husman's termination, thus creating a disputed issue of material fact sufficient to defeat the motion for summary judgment.

---

[12]    The trial court found Toyota had carried its burden based on Husman's inappropriate comments to fellow employees for which he was disciplined with the warning letter in early May 2011. That is not correct; both Bybee and Pelliccioni testified termination was not contemplated when they met with Husman six weeks later on June 23, 2011, the meeting at which Pelliccioni offered Husman the opportunity to work with an executive coach.

24

a. *Husman has not forfeited mixed-motive analysis*

Although Toyota included a mixed-motive defense in its answer, neither party discussed *Harris* or mixed-motive analysis in its summary judgment papers or briefs on appeal. We instructed counsel to be prepared at oral argument to address the applicability of *Harris* to this case.

Citing several federal circuit court decisions and this court's decision in *Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, Toyota argued Husman had waived (forfeited) any mixed-motive analysis by failing to expressly raise it in the trial court. The cited federal cases (predominantly from the Fifth Circuit) do employ a strict forfeiture analysis. Our decision in *Alamo,* however, applied the forfeiture doctrine in an appeal by a defendant following a jury trial and was based on the employer's failure to assert as an affirmative defense that it had not discriminated against plaintiff or had legitimate reasons for discharging her. (*Id.* at p. 482.) That is not this case. Moreover, "[a]n exception to the general rule may be presented . . . where the theory presented for the first time on appeal involves only a legal question determinable from facts which not only are uncontroverted in the record, but which could not be altered by the presentation of additional evidence. [Citation.] And whether the general rule shall be applied is largely a question of the appellate court's discretion." (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167; accord, *In re Marriage of Priem* (2013) 214 Cal.App.4th 505, 510-511; see *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 326; see also *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 599 ["'[i]t makes no difference that the issue was first raised on

25

appeal by the court rather than the parties, as long as the parties have been given a reasonable opportunity to address it'"].)

We exercise that discretion in this case. Husman's evidence that discrimination was a substantial motivating factor for his discharge was set forth in his separate statement of disputed facts (cf. *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28 [in reviewing ruling on summary judgment motion an appellate court will consider only the facts before the trial court at the time it ruled on the motion]); and his counsel argued, notwithstanding Toyota's evidence of legitimate business reasons for the termination, Husman's evidence created a triable issue of material fact with regard to Toyota's liability under FEHA. Although Husman did not cite *Harris* or identify his claim as relying on mixed-motive analysis, he provided the trial court with all of the elements of a mixed-motive claim. And, as discussed, the inquiry at this stage of the proceedings is essentially the same, focusing on whether the employment decision was substantially motivated by discriminatory animus.

b. *The conflicting same-actor and cat's paw inferences*

In challenging the contention discrimination played any role in these events, Toyota heavily relies—as did the trial court—on the allegedly undisputed fact that Borst, the person responsible for Husman's advancement at Toyota, was also the person who fired him, a factual pattern cited by a number of courts as "same-actor" evidence susceptible to a strong inference the actor harbors no discriminatory motive. (See *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 809 ["where the same actor is responsible for both the hiring and firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no

26

discriminatory motive'"].)  According to this theory, "'"[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job."'"  (*Ibid.*)

Husman responds that Pelliccioni, whom he believed was biased against him, was directly involved in his termination and acted as the "cat's paw" that influenced the decision, even if Borst believed he made the decision independently.  (See *DeJung v. Superior Court*, *supra*, 169 Cal.App.4th at p. 551 [under the cat's paw theory, "showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus"]; *Reeves v. Safeway Stores, Inc., supra*, 121 Cal.App.4th at p. 100 [reversing summary judgment because the evidence raised triable issues of fact as to whether the supervisor's action was precipitated by the improper motivations of his intermediate managers].)

While once commonly relied on by courts affirming summary judgment against a plaintiff alleging discriminatory action, the same-actor inference has lost some of its persuasive appeal in recent years.  For instance, in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243 Division Two of the First District —the same court that had previously decided *Horn v. Cushman & Wakefield Western, Inc.*—cautioned that, while same-actor evidence could generate an inference (and not a presumption) of nondiscrimination, "the effect should not be an a priori determination, divorced from its factual context[,] . . . be placed in a special category, or have some undue importance attached to it, for that could threaten to undermine the right to a jury trial by

27

improperly easing the burden on employers in summary judgment." (*Nazir*, at p. 273, fn. omitted.)  The court found the inference inapplicable under the circumstances of that case in which the supervisor exhibited hostility toward the plaintiff during the promotion process, had an "axe to grind" that tained the investigation and then later terminated him.  (*Id.* at pp. 274-277.)

Scholars have also cautioned that "[p]sychological science on moral licensing reveals that, when a person makes both an initial positive employment decision and a subsequent negative employment decision against a member of a protected group, the second negative decision is *more likely* to have resulted from bias, *not less*." (Quintanilla & Kaiser, *The Same-Actor Inference of Nondiscrimination:  Moral Credentialing and the Psychological and Legal Licensing of Bias* (2016) 104 Cal. L.Rev. 1, 10, fn. omitted.)  "Supervisors often behave as if hiring a member of a protected group provides them with a moral credential of being bias free, which inhibits their egalitarianism when making other decisions that affect that employee.  As such, [courts] have developed an interstitial doctrine that is behaviorally unrealistic and inconsistent with how humans actually behave." (*Ibid.*)  The authors cite the Seventh Circuit as offering an appropriate jurisprudential approach to same-actor evidence, admitting it as circumstantial evidence to be weighed with all other evidence by the trier of fact with no prescribed inference in favor of either side. (*Id.* at pp. 10-11 [discussing *Perez v. Thorntons, Inc.* (7th Cir. 2013) 731 F.3d 699, 710]; see also *Johnson v. Zema Systems Corp.* (7th Cir. 1999) 170 F.3d 734, 745 [questioning psychological underpinning of same-actor inference; "an employer might be unaware of his own stereotypical views of African-

Americans at the time of hiring"]; but see Quintanilla & Kaiser, at pp. 36-37 [discussing other circuit courts that equate the same-actor inference to "a virtually irrefutable presumption of nondiscrimination," rebuttable only by direct evidence of discrimination to survive summary judgment].) As the authors point out, "reliance on the same-actor inference to carry the moving party over the hurdle of summary judgment is legally impermissible, because drawing legitimate inferences from the facts are jury functions and, at summary judgment, the court must disregard all evidence favorable to the moving party that the jury is not required to believe." (Quintanilla & Kaiser, at p. 38.)

In the case at bar, the evidence asserted by Toyota to support the same-actor inference is also susceptible to reasonable inferences favorable to Husman that must be credited on summary judgment. Notwithstanding Borst's plain sway over his subordinate executives, hiring, promotion and firing decisions at TFS were made by consultation with members of a management committee, thereby offering substantial opportunity for other executives to influence Borst's perceptions. As to Husman's 2010 promotion, Borst, Pelliccioni, Bybee and Wada each had input into the decision. While Bybee and Wada did not confess to reservations about Husman's promotion, Pelliccioni admitted to unspecified doubts but hid them in deference to Borst's endorsement of Husman. Likewise, the termination decision followed extensive discussions among these same executives about Husman's performance, few of which were addressed by Toyota in its separate statement but were acknowledged by Pelliccioni in his subsequent statements to the consultant investigating the termination. Indeed, Borst's claim he made the decision unilaterally is incompatible with the record's depiction of how

29

management operated at Toyota.  As one California court observed in criticizing an inference arising from a supervisor's purported ignorance of the plaintiff's complaints to other managers, "This concept—which for convenience we will call the 'defense of ignorance'—poses few analytical challenges so long as the 'employer' is conceived as a single entity receiving and responding to stimuli as a unitary, indivisible organism.  But this is often an inaccurate picture in a world where a majority of workers are employed by large economic enterprises with layered and compartmentalized management structures.  In such enterprises, decisions significantly affecting personnel are rarely if ever the responsibility of a single actor.  As a result, unexamined assertions about the knowledge, ignorance, or motives of 'the employer' may be fraught with ambiguities, untested assumptions, and begged questions."  (*Reeves v. Safeway Stores, Inc., supra,* 121 Cal.App.4th at p. 108.)

Moreover, Bybee's statements to Husman when informing him of his termination cast doubt as to the linear process depicted by Toyota and the cited basis for termination.  Bybee admitted she told Husman he was being terminated because he had "excluded the majority," meaning he had failed to obtain the buy-in of "the majority," Toyota's non-diverse employees.  Husman understood this to mean he had focused too much on LGBT issues, a reasonable interpretation (although not the only interpretation) of the remark.  Moreover, according to Husman, Bybee told him Pelliccioni "had it out for him" and suggested he appeal to Borst— hence Husman's apologetic email to Borst asking for reconsideration.  Although Toyota insists Bybee simply did not know the course of events when she spoke with Husman and mistakenly believed Pelliccioni had made the decision, ignoring

30

Husman's account of the conversation would require us to weigh the facts and disregard inferences in his favor, something we are prohibited from doing on summary judgment.

c. *Husman's evidence of Pelliccioni's biased remarks*

In *Reid, supra,* 50 Cal.4th 512 the Supreme Court explained that discriminatory remarks can be relevant in determining whether intentional discrimination occurred: "Although stray remarks may not have strong probative value when viewed in isolation, they may corroborate direct evidence of discrimination or gain significance in conjunction with other circumstantial evidence. Certainly, who made the comments, when they were made in relation to the adverse employment decision, and in what context they were made are all factors that should be considered. Thus, a trial court must review and base its summary judgment determination on the totality of evidence in the record, including any relevant discriminatory remarks." (*Id.* at p. 541.) The *Reid* Court further stated: "A stray remark alone may not create a triable issue of . . . discrimination. . . . But when combined with other evidence of pretext, an otherwise stray remark may create an 'ensemble [that] *is* sufficient to defeat summary judgment.'" (*Id.* at pp. 541-542, original italics.) This "totality of circumstances analysis" allows courts to "winnow[] out cases 'too weak to raise a rational inference that discrimination occurred.'" (*Id.* at p. 541, citing *Guz, supra,* 24 Cal.4th at p. 362; see *Harris, supra,* 56 Cal.4th at p. 231 ["section 12940(a) does not purport to outlaw discriminatory thoughts, beliefs, or stray remarks that are unconnected to employment decisionmaking"].)

Husman presented evidence that Pelliccioni harbored stereotypical views of gay men and articulated clear opinions as to what he considered appropriate gender identity expression,

31

observing at various times that Husman had made "a very clear statement" about his sexual orientation and should cut his hair, as well as ridiculing him for wearing a scarf as an accessory when it was not cold outside.  Husman argues these remarks, while possibly not patently offensive to a non-gay observer, revealed that Pelliccioni viewed him as "too gay" and incompatible with Toyota's corporate culture, even if a less obviously gay employee would be acceptable.  Although perhaps less flagrantly offensive than the criticisms offered by Price Waterhouse partners, these remarks reveal the same kind of stereotypical thinking that led those partners not to promote Ann Hopkins.

As one commentator has explained, "One useful example of the way in which straightforward sexual-orientation discrimination claims fail in cases where sex stereotyping would succeed is that of the 'gayer' plaintiff—in other words, of an LGBT person who is treated worse than another employee of the same sexual orientation who behaves in such a way as to deflect attention from her status." (Herz, *Price's Progress:  Sex Stereotyping and Its Potential for Antidiscrimination Law* (2014) 124 Yale L.J. 396, 428.)  "In these cases, while the discrimination clearly arises from antigay bias, the employer's preference for gender-conforming, 'less gay' coworkers makes the case unintelligible without a *Price Waterhouse* framework." (*Id.* at p. 432.)  "If the plaintiff can successfully demonstrate that the defendant was motivated by his dislike of these behaviors, the question then becomes whether that dislike was motivated by discriminatory ideas about how different sexes should behave. This is a hard question for plaintiffs to answer, but it is a fair question for courts to ask, and it gets at the heart of what makes sex stereotyping so pernicious.  *Price Waterhouse* claims, by

focusing on specific behaviors rather than group identification, allow courts to reach subtler and more individuated forms of sex, and sexual orientation, discrimination." (*Id.* at pp. 434-435.)

Thus, even if Pelliccioni's remarks were not made in the direct context of the termination decision, given Pelliccioni's position it is difficult to deny that any bias he felt or expressed toward Husman had the capacity to affect management's perceptions of Husman's performance and attitude, as well as exacerbate Husman's own increasingly alienated behavior. (See *Reid*, *supra*, 50 Cal.4th at p. 541.) This connection was confirmed by Bybee's statements to Husman that he was being fired for "excluding the majority" and that Pelliccioni had it out for him. As such, Pelliccioni's remarks were sufficiently connected to the ultimate decision to terminate Husman and should have been considered by the trial court in evaluating the justification for termination proffered by Bybee.

Indulging these inferences in Husman's favor, as we must, he has raised a triable issue of material fact that impermissible bias was a substantial motivating factor for his termination.[13]

---

[13] Husman's cause of action for wrongful termination in violation of public policy/discrimination is grounded on the same conduct as his FEHA discrimination claim. Because Husman has established a triable issue of material fact as to whether invidious sex or gender stereotyping related to his sexual orientation was a substantial motivating factor for his termination, summary adjudication on his common law wrongful termination cause of action should have been denied. (See *Soria, supra,* 5 Cal.App.5th at p. 604; see also *Davis v. Farmers Ins. Exchange* (2016) 245 Cal.App.4th 1302, 1323 [jury instructions in mixed-motive common law wrongful termination case must be

While this is a close case, especially in light of the evidence of Toyota's ongoing efforts to promote diversity and inclusion, the trial court's failure to look behind the company's assertions of moral right and Borst's purportedly autonomous role in the decision to fire Husman was error and contrary to *Harris*'s nuanced analysis of complex discriminatory behavior.

4. *Husman Failed To Raise a Triable Issue of Fact That Toyota Discharged Him in Response to His Complaints About Prohibited Actions*

The retaliation provision of FEHA forbids an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under" FEHA.  (§ 12940, subd. (h).)  "Employees may establish a prima facie case of unlawful retaliation by showing that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action."  (*Miller v. Department of Corrections, supra,* 36 Cal.4th at p. 472; accord, *Yanowitz v. L'Orea USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*); see *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713-715.)  Like claims for discrimination, retaliation claims are subject to the *McDonnell Douglas* burden-shifting analysis.  (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109.)

Although "[r]etaliation claims are inherently fact-specific" (*Yanowitz, supra,* 36 Cal.4th at p. 1052), "an employee's

---

the same as prescribed by Supreme Court in *Harris* for mixed-motive FEHA discrimination claim].)

34

unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination." (*Id.* at p. 1046.) "[C]omplaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." (*Id.* at p. 1047; accord, *Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, 1046.) Of course, an employee need not explicitly and directly inform his or her employer he or she believes the employer's conduct was discriminatory or otherwise forbidden by FEHA. (*Yanowitz,* at p. 1046; *Castro-Ramirez,* at p. 1046.) "'The relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.'" (*Yanowitz,* at p. 1047; accord, *Castro-Ramirez,* at p. 1047.)

Husman points to two instances he claims support his charge of retaliation: 1) his complaint to Vincent Bray that Pelliccioni had refused to include AIDS Walk LA on the list of automatic payroll deductions; and 2) his comment to the Diversity Advisory Board that, while Toyota's LGBT employees had made some progress, there was still work to be done.[14] The first

---

[14] Husman also cites the complaint of anti-gay discrimination he made in late September 2011 after he was notified by Bybee he had been terminated. We agree with Toyota that this complaint could not have been relevant to the decision to terminate him.

incident does not qualify as a basis for a claim of retaliation because Pelliccioni's denial of Husman's request did not violate any FEHA prohibition.  (See *Yanowitz*, *supra*, 36 Cal.4th at p. 1047 [no prima facie case of retaliation unless the employee conveys a reasonable concern "'the employer has acted or is acting in an unlawful discriminatory manner'"]; *Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 245 ["'case law and FEHA's implementing regulations are uniformly premised on the principle that the nature of activities protected by section 12940, subdivision (h) demonstrate some degree of opposition to or protest of the employer's conduct or practices based on the employee's reasonable belief that the employer's action or practice is unlawful,'" italics omitted].)

Similarly, Husman's statement to the Diversity Advisory Board falls short of communicating a particularized complaint about discriminatory treatment of LGBT employees and, instead, was likely understood as an exhortation common among diversity advocates to the effect that, while progress has been made, much work remains to be done.  (See *Hood v. Pfizer, Inc.* (3d Cir. 2009) 322 Fed.Appx. 124, 126, 131 [employee's question at company-wide meeting "'why Pfizer wasn't doing more to promote diversity'" expressed "a generalized concern" about diversity, "worlds apart from the kind of particularized statement targeting discrete past events" necessary to survive summary judgment].) While Husman believed his statement angered Borst, Borst testified he did not even remember the statement.  Indeed, Borst's

(See *Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1052 [retaliation claim rejected when alleged wrongful acts occurred before sexual harassment complaint was filed]; see also *Chen v. County of Orange* (2002) 96 Cal.App.4th 926, 948.)

message at the June 2011 awards reception was essentially the same, stating the generalized desire that, someday, a diversity and inclusion officer would no longer be necessary.

Absent the identification of some more pointed criticism or opposition salient to an act reasonably believed to be prohibited by FEHA, Husman failed to raise a triable issue of fact supporting his claim of retaliation.[15]

## DISPOSITION

The judgment is reversed, and the order granting summary judgment is vacated. The superior court is to enter a new order denying summary adjudication of Husman's claims of employment discrimination based on sexual orientation and wrongful termination in violation of public policy/discrimination but otherwise granting the motion. The parties are to bear their own costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.                              SMALL, J.[*]

---

[15]    Because Husman's FEHA retaliation claim fails, his claim for wrongful termination in violation of public policy/retaliation premised on the same allegation fails as well. (See *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 229.)

[*]    Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.