Filed 1/20/23 Williams v. Fox Networks Engineers and Operations CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### SECOND APPELLATE DISTRICT
### DIVISION FOUR

| | |
|---|---|
| PATRICK WILLIAMS, | B309868 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. 19STCV05366) |
| FOX NETWORKS ENGINEERS AND OPERATIONS et al., | MODIFICATION ORDER [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

COURT:

It is ordered that the opinion filed herein on December 21, 2022 be modified as follows:

1. In the sixth paragraph under the heading "Facts and Procedural History" and the subheading "I. Background," the first sentence should be replaced with the following language, with the footnote remaining unchanged: At the time, Fox employed seven regular finishing editors working an average of four or five shifts per week—Williams, Thomas Stock-Hendel,[fn] J.T, D.F., P.W., D.Y., and R.C.

2. In the same paragraph, the fourth and fifth sentences should be replaced with the following language: As of October 2017, these fill-in/part-time editors were T.R. and D.W., who were 54 and 45 years old, respectively. Williams was 63 years old, the third oldest of the finishing editors after Stock-Hendel (66) and J.T. (64).

3. In the following paragraph, the second and third sentences should be replaced with the following language, with the footnote remaining unchanged: They selected four regular editors, reducing P.W. and J.T. from five to four shifts per week, and Williams and Stock-Hendel from four to an average of two and a half shifts per week.[fn] Fox also reduced the shifts of part-time editor T.R. from one to zero, and increased the shifts of D.W. from one to two.

4. In the final paragraph under the heading "Facts and Procedural History" and the subheading "I. Background," the second sentence should be replaced with the following language: As of 2019, Fox continued to employ J.T., D.F., P.W., D.Y., and R.C. as regular editors working four to five shifts per week, and T.R. and D.W. as part-time or fill-in editors.

5. In the seventh paragraph under the heading "Facts and Procedural History" and the subheadings "III. Summary

Judgment," and "A. Fox's Motion," the proper name at the beginning of the second sentence should be replaced with the initials "D.W."  The proper name at the beginning of the fourth sentence should be replaced with the initials "D.Y."  The proper name at the beginning of the fifth sentence should be replaced with the initials "P.W."  The proper name at the beginning of the seventh sentence should be replaced with the initials "R.C."

6.  In the following paragraph, the second sentence should be replaced with the following language:  He believed that he, Stock-Hendel, and P.W. were "really good" editors, because they would "take the extra time to make sure [a promo] looked as good as it possibly could."

7. In the second paragraph under the heading "Facts and Procedural History" and the subheadings "III. Summary Judgment," and "B. Williams's Opposition," the last sentence should be replaced with the following language:  Williams also declared that at "various times during the last few years I was at Fox," he heard DiPietro state that P.W. "was the slowest finishing editor."

8.  In the sixth paragraph under the heading "Facts and Procedural History" and the subheadings "III. Summary Judgment," and "B. Williams's Opposition," the first sentence should be replaced with the following language: Williams also pointed to testimony by fill-in editor D.W. in 2019 (then age 47) that over the past year, he worked two shifts a week.

9.  In the third paragraph under the heading "Facts and Procedural History" and the subheadings "III. Summary Judgment," and "D. Ruling," the third and fourth sentences should be replaced with the following language:  The court noted

that Williams's evidence showed that D.W., a younger, fill-in finishing editor, was regularly scheduled to work two days per week, the same number of shifts assigned to J.T., who was about the same age as Williams. Although Williams claimed that D.W. received up to five shifts per week, the court found that this occurred only when he was filling in for absent editors, and that Williams "also would have been considered for finishing editor work on a fill-in basis" going forward.

10. In the second paragraph under the heading "Discussion" and the subheadings "II. Analysis," and "A. Ruling on Objections," the bracketed proper name in the first sentence should be replaced with the initials "P.W." In the fourth paragraph of the same section, the same proper name should be replaced with the initials "P.W."

11. In the second paragraph under the heading "Discussion" and the subheadings "II. Analysis," and "B. No Triable Issue of Pretext," the third proper name in parentheses should be replaced with the initials "J.T."

12. In the eighth paragraph under the heading "Discussion" and the subheadings "II. Analysis," and "B. No Triable Issue of Pretext," the fourth and fifth sentences should be replaced with the following language: At that time, the evidence shows that Fox increased the number of shifts for one of the fill-in editors, D.W. (age 45), from one to two per week, but also cut the same number of shifts from the other fill-in editor, T.R. (age 54), from one to zero. In 2018, Fox eliminated the shifts of two editors, Stock-Hendel and Williams, the first and third oldest editors, respectively, but retained the second-oldest, J.T. (age 65), as well as the fourth-oldest, D.F. (age 60).

13. In the same paragraph, the seventh and eighth sentences should be replaced with the following language: Williams contends that fill-in editor D.W. later had his shifts increased to between three and five per week. However, the evidence shows that D.W. remained at an average of two shifts per week, working more only as a fill-in to cover absences or vacations, shifts for which Williams also was eligible.

There is no change in the judgment.

_____

COLLINS, ACTING P.J.  CURREY, J.  SCADUTO, J*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/21/22  Williams v. Fox Networks Engineers and Operations CA2/4
(unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PATRICK WILLIAMS, | B309868 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No.19STCV05366) |
| FOX NETWORKS ENGINEERS AND OPERATIONS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lia Martin, Judge.  Affirmed.

Law Offices of Jeffrey C. McIntyre, Jeffrey Curran McIntyre, Robert Garcia, Jr. for Plaintiff and Appellant.

Mitchell, Silberberg & Knupp, Seth E. Pierce, Bradley J. Mullins for Defendants and Respondents.

Patrick Williams appeals following the trial court's grant of summary judgment in favor of his former employer, respondent Fox Digital Enterprises, Inc. (Fox). The trial court concluded Williams had established a prima facie case of wrongful termination based on his age in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.), but that Fox had a legitimate, nondiscriminatory reason for its decisions to reduce and then eliminate Williams's shifts, and Williams failed to present sufficient evidence that Fox's reasons were pretextual. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### I.  *Background*

The following facts are undisputed. Williams was born in 1954. He began working for Fox in its promo department in 1984 as a finishing editor. A finishing editor's job is to place the final video editing touches on promos—the "short teaser ads" broadcast on the Fox television network to promote upcoming television shows. The finishing editor receives a rough cut of a promo and finalizes it by adding special effects and graphics, adjusting coloring, and performing other editing tasks. Room producers assigned work to the finishing editors, oversaw the editing, and approved the final promos. The finishing editors generally worked alone in editing bays, with a room producer present part of the time.

Finishing editors are employed as "daily hires" pursuant to a collective bargaining agreement (CBA) with their union. This means that, technically, they are rehired for each day of work and scheduled for two weeks at a time. Because Fox's needs for promo work vary over the course of a television season, this policy allows the company flexibility to increase or decrease staff

2

as needed.  The union negotiated a premium wage to compensate for this lack of job security.  Although Williams was therefore a daily hire during his tenure at Fox, in practice, he was continuously scheduled for work (except for vacations) from 1984 until the elimination of his shifts in 2018.

Under the applicable CBA, Fox utilized a "bifurcated structure" for the supervision of finishing editors.  The direct supervisor for Williams and the other finishing editors was William Morales, Vice President of Entertainment Post Production Engineering.  However, assignment of shifts was handled by Christy Cofer and Tina Manos, Vice President and Director, respectively, of On-Air Marketing Operations.  Cofer and Manos determined how many and which editors to schedule for each shift.  The scheduling department, under Morales, implemented those scheduling choices.  Cofer and Manos also supervised the room producers.

In 2009, Williams's regular schedule was reduced from five to four shifts per week.  He was subsequently offered additional shifts if there was a need and he was available. Williams has not claimed that the 2009 reduction was discriminatory.

In September 2017, Fox informed the promo department that it needed to reduce its operating expenses by $1,000,000.  Cofer and Manos, with Morales' assistance, were tasked with implementing these cuts, including by cutting excess shifts.  In a meeting on October 4, 2017, the editors were informed that the promo department would not be allowed to exceed its budget, as it had in the past, and that staffing cuts would be forthcoming.

At the time, Fox employed seven regular finishing editors working an average of four or five shifts per week—Williams,

Thomas Stock-Hendel,[1] Jack Thannum, Daryl Frederick, Paul Ware, David Yount, and Ruth Cooper. These editors ranged in age from 50 to 66 years old. Fox also employed fill-in or part-time finishing editors, who regularly worked two or fewer shifts and provided additional coverage when another editor was sick or on vacation, or more staff was needed. As of October 2017, these fill-in/part-time editors were Thomas Reichlin and Dylan Way, who were 54 and 45 years old, respectively. Williams was 63 years old, the third oldest of the finishing editors after Stock-Hendel (66) and Thannum(64).

As part of the 2017 cuts, Cofer and Manos decided to eliminate six shifts per week in the finishing department. They selected four regular editors, reducing Ware and Thannum from five to four shifts per week, and Williams and Stock-Hendel from four to an average of two and a half shifts per week.[2] Fox also reduced the shifts of part-time editor Reichlin from one to zero, and increased the shifts of Way from one to two. Following the reduction, Williams was periodically offered additional shifts when there was a need and he was available.

In the spring of 2018, Cofer and Manos examined continuing staffing inefficiencies in the finishing department. These included the "early release" of some night shift editors, which occurred when editors finished work and left early but

---

[1] Fox reduced and then eliminated the shifts for Stock-Hendel along with Williams. Stock-Hendel filed a separate lawsuit against Fox alleging age discrimination.

[2] Williams and Stock-Hendel had a practice of alternating day and night shifts. After the 2017 reduction, they alternated two day shifts and three night shifts per week, thus averaging two and a half shifts each.

were still paid for a full shift under the CBA. Cofer and Manos also determined that, based on projected upcoming needs, they could further reduce the number of finishing editor shifts. They decided to eliminate the remaining shifts worked by both Williams and Stock-Hendel. On July 13, 2018, Morales informed Williams that his shifts were being eliminated. Williams's regularly scheduled shifts have never been restored.

The total number of finishing editor shifts scheduled by Fox dropped each year from 2016 to 2019. As of 2019, Fox continued to employ Thannum, Frederick, Ware, Yount, and Cooper as regular editors working four to five shifts per week, and Reichlin and Way as part-time or fill-in editors.

## II. *Complaint*

Williams filed a complaint on February 14, 2019 against Fox ,[3] alleging claims for age discrimination under the FEHA and wrongful termination in violation of public policy. Both claims were based on his allegations that in 2017, Fox "began severely reducing the number of hours plaintiff was assigned to work, all while assigning more hours to younger employees in the same job category." Williams further alleged that on July 13, 2018, he was terminated, while Fox subsequently "increased the number of work hours for younger employees with less experience than plaintiff."

## III. *Summary Judgment*

### A. *Fox's Motion*

Fox filed a motion for summary judgment or, in the

---

[3] Williams also named Fox Digital Enterprises, Inc., and Fox Payroll Services, Inc. as defendants. The parties later stipulated to dismiss these defendants with prejudice.

5

alternative, summary adjudication pursuant to Code of Civil Procedure section 437c.[4]  Fox argued that Williams could not establish a prima facie case of age discrimination, as he had no evidence of age-based comments or other circumstances suggesting a discriminatory motive for his termination.  In addition, Fox argued that even if Williams could establish a prima face case, his claim failed as a matter of law because he could not establish that Fox's legitimate, non-discriminatory reasons for his shift reduction and termination were pretextual.[5]

In support of these arguments, Fox offered evidence that the shift reductions in 2017 and 2018 were financially motivated. Cofer, Manos, and Morales all testified that they were informed in 2017 by the head of the promo department that the department needed to reduce expenses by $1,000,000.  They decided to cut six finishing editor shifts to achieve this reduction. Similarly, Williams acknowledged during his deposition that he was told of the impending budget cuts in 2017 and that when Fox reduced his shifts, the department shut down an edit bay, which seemed to be part of the effort to cut costs.

Fox also presented declarations and deposition testimony

---

[4] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[5]    Fox further argued that Williams's claim as to the October 2017 shift reduction was barred because Williams failed to timely exhaust his administrative remedies as to that claim and because Williams "himself does not claim that that decision was motivated by his age."  In addition, Fox contended that Williams could not support his claim for punitive damages.  The trial court denied summary adjudication on these issues and they were not raised by either party on appeal.

by Cofer and Manos regarding the decision as to which employees to cut. Cofer stated that she relied on Manos in deciding whose shifts to reduce in 2017 and 2018 because of Manos's prior experience as a room producer. Manos worked with many of the current finishing editors, and frequently communicated with room producers regarding finishing editors' performance. Both Cofer and Manos stated that they decided which editors to cut by focusing on those they "believed to be the weakest performers."

According to both Cofer and Manos, they selected Williams for the 2017 shift reduction because he was the "slowest/least efficient of the finishing editors and that compared to the other finishing editors, he did not seem to demonstrate a strong work ethic (e.g., he periodically arrived late for his shift and then seemed eager to leave)." Cofer stated that she based this belief on what Manos had told her, what she had heard from room producers, and her understanding that "Williams was widely perceived as the weakest performer of the group."

According to Manos, "while Williams did adequate editing work . . . [he] was the slowest/least efficient of the finishing editors," which was "less of an issue when the department was heavily staffed (even over-staffed), but as we were cutting budget and shifts, we needed to keep the finishing editors who could efficiently produce the highest volume of quality promos." Manos stated in her declaration that "Williams was widely perceived as the weakest performer" of the finishing editors, an opinion she based on "conversations (over the years) with other room producers, managers and supervisors, and other finishing editors." Manos similarly testified during her deposition that Williams was the first to be chosen to cut because "he was the slowest." She also testified that Williams "was usually very eager

7

to get out the door," and was late arriving to work "on occasion." Manos also stated that she spoke with room producer Steve DiPietro about the planned cuts, and he either agreed with her selection of Williams and Stock-Hendel or suggested them himself.[6]

Fox also provided a declaration from DiPietro, who worked as a room producer and manager in Fox's promo department for 21 years. DiPietro declared that Williams was "a weaker performer than the other finishing editors with whom I worked," and was the "slowest/least efficient" of the editors. In his deposition, DiPietro testified that "everyone" in the department knew that Williams was slow. As an example, DiPietro recalled an instance where he gave Williams and another editor "similar" projects, which the other editor finished in approximately 20 minutes, while Williams took approximately two hours to complete his project. DiPietro stated that he had "asked Williams several times to speed up his work, but I did not see improvement." DiPietro also testified that he shared his concerns regarding Williams with Manos. In 2017, when Manos informed DiPietro of the planned shift reductions for finishing editors, he recalled that the "answer was obvious to me – Williams was the weakest performer and should be the first finishing editor to have his shifts reduced," compared to his "higher-performing or more skilled peers." DiPietro also declared, in an identical statement to those given by Cofer and Manos, that "compared to the other

---

[6]    Fox contended that Stock-Hendel was the next slowest finishing editor after Williams. It also asserted that Stock-Hendel struggled to work independently, was inefficient, and sometimes pushed back on editing directions.

finishing editors, [Williams] did not seem to demonstrate a strong work ethic (e.g., he periodically arrived late for his shift and then seemed eager to leave)."  DiPietro elaborated during his deposition regarding his claim about work ethic, testifying that Williams "would arrive late a lot," coming in five to 20 minutes late.  He did not raise it with Cofer or Manos because "at that point I just kind of accepted that he's slow and, you know, 15 minutes late isn't gonna be that much difference in his bay."

In addition, several other finishing editors testified that Williams was the slowest of the group.  Way testified that Williams was the slowest editor, and that room producers "would talk about how things would take longer to come out of Pat's bay."  He stated that this opinion was "pretty much unanimous" but specifically recalled hearing it from DiPietro and another producer.  Yount testified that he personally felt and had heard from other editors and room producers that Williams "took longer to do things so that he wouldn't be given more work." Ware testified to hearing that Williams was "really meticulous" and "his stuff would always take a long time."  Specifically, he recalled hearing from "all" of the room producers, including Manos, that Williams was too slow.  Cooper opined that Williams was a talented editor who was very knowledgeable, but "he never seemed very interested in getting the work done. Simple spots were given to him and it would still take an inordinate amount of time."

Fox also introduced excerpts from Williams's deposition, in which he testified that he was meticulous and a perfectionist in his work.  He believed that he, Stock-Hendel, and Ware were "really good" editors, because they would "take the extra time to make sure [a promo] looked as good as it possibly could."  By

9

contrast, Williams did not think the other editors produced the same quality work, noting that he sometimes "would be embarrassed" by the way some promos "looked on the air." Williams acknowledged that sometimes room producers would not appreciate the work he was putting into the promos, stating in particular that DiPietro was "more about speed than quality." Williams testified that during his early career at Fox, the department placed more focus on quality and perfection, whereas toward the end, the department's focus shifted toward getting the promos finished quickly.

When asked whether he was ever told he needed to finish promos more quickly, Williams testified, "I think that may be the case." He elaborated that if he was taking extra time on a promo, a room producer such as DiPietro would come into the room and ask what was taking so long. Williams would explain the reason, but acknowledged that "in [the producer's] mind, they might think oh, yeah, he was taking way too long on that." When asked if anyone ever spoke to him about not finishing projects on a timely basis, he testified: "I know they wanted them done sometimes a little bit faster to – I don't think I ever missed a deadline." Williams testified that he was late "maybe every once in a while" but would always call ahead. He further estimated he might have been late "maybe ten times" in the past five years.

For the 2018 reduction that eliminated Williams's shifts, Cofer stated that she again leaned heavily on Manos's judgment. Both Cofer and Manos testified that they concluded that Williams remained the weakest performer and therefore decided to eliminate his shifts. DiPietro also agreed with the decision by Manos and Cofer to eliminate the remaining shifts for Williams and Stock-Hendel for the same reasons he had indicated in 2017.

Cofer, Manos, and Morales testified that no one had been hired to replace Williams, and that one of the two editing bays Williams worked in remained unused for finishing editor work except for temporarily added shifts. Williams also testified that to his understanding, in 2018 Fox was "going to shut down one edit bay totally," because "they thought the workload was going to be a lot less." In his declaration, Morales stated that the hourly rates for finishing editors were negotiated by each editor upon hiring, then "typically increased a small percentage each year as a matter of course (regardless of performance)." He also provided the range of pay rates for the finishing editors as of October 2017 and stated that Williams and Stock-Hendel were not the highest paid finishing editors in 2017 and 2018, anticipating Williams's claim to the contrary.

B.   *Williams's Opposition*

In his opposition, Williams argued that his evidence established a prima facie case of age discrimination because of the three oldest finishing editors, all in their 60s, two were let go and the third had his shifts reduced, while the remaining editors were younger "by approximately five to almost 20 years." He also argued there was evidence of pretext, based on his showing that he was never counseled or reprimanded for any issue regarding his work ethic or purported slowness, he was one of the most highly paid finishing editors, and he had presented evidence of his stellar work performance and attitude.

Williams presented his own declaration, stating that he had been "late no more than four to five times" in his last five years at Fox, and had never received any communication complaining about his attendance, lateness, or work ethic. Williams also declared that he was "often asked, and agreed to

11

stay late to finish up promo work," and was "often the last finishing editor to be in the office." Williams denied that DiPietro ever told him to speed up his work or that he was ever warned about being a slow worker from management or Human Resources. He claimed that he was "a careful worker who made every effort to create error free promos," and was often complimented by managers for "my work ethic and editing skills." Williams also declared that at "various times during the last few years I was at Fox," he heard DiPietro state that Ware "was the slowest finishing editor."[7]

Williams stated that at the time of his termination, he was making $90.13 per hour. He also stated that when he previously received raises, he was told by his bosses that those raises were based on "my overall performance."

Williams also provided declarations from several other former Fox employees. Laura Bloom was a graphic artist at Fox from 1999 to 2019, working directly with finishing editors. She declared that in her experience, Williams had "an excellent attitude toward his work," was "consistently on time to work," and she was "aware that he had a reputation for being a very good finishing editor." Mark Bonn, who worked as an offline editor (working on the rough cuts of promos) from 1988 to 2016, stated that he thought Williams and Stock-Hendel "required the least amount of direction and explanation as to what was needed and because of all the finishing editors with whom I worked their work was by far the best done and most error free." He never heard anyone complain that Williams was less competent than

___

[7] The trial court sustained Fox's objection to this statement, which we discuss further below.

other editors. Bonn also testified that in 2005 or 2006, Williams and Stock-Hendel were the two highest paid finishing editors, which he knew because he was involved in union negotiations.

Williams also cited to excerpts from Cofer's deposition, in which she testified that she would reach out to Morales to handle an issue with an employee if it was "pervasive." She acknowledged that she did not reach out to Morales about Williams or discuss any issues directly with Williams. Similarly, although Manos testified that she would often see Williams coming in late, she did not speak to Morales about it. She admitted that she would refer issues regarding editors to Morales when "the producers had a problem" with it.

Williams also pointed to testimony by fill-in editor Way in 2019 (then age 47) that over the past year, he worked two shifts a week. However, in the month before the deposition, he averaged three shifts per week because Fox was busier with mid-season replacement shows.

In addition, Williams cited to an email from Morales to Cofer in September 2017, discussing the planned shift reduction and noting an hourly rate for finishing editors of $85. In Morales's deposition, he testified that he arrived at this number by averaging the finishing editor's rates for the purposes of preparing a "forecast." Williams argued that this supported his claim that he made significantly more than the average rate for the finishing editors in the department.

C. ***Fox's Reply***

In reply, Fox argued that Williams's own testimony acknowledged his perfectionism and thus supported Fox's contention that he was the slowest. Fox noted that Williams was "not terminated because he produced poor quality or error-ridden

work," but because he spent too much time on promos. Fox also contended that Williams misstated the facts by claiming only the three oldest editors were cut and that the youngest editor received a drastic increase in shifts in 2018.

Fox provided an additional declaration from Morales, which included the statement that his prior testimony regarding the $85 per hour rate was "only an estimate." Morales also provided the number of shifts per year and hourly rates of all the finishing editors between 2015 and 2018. Fox also included additional excerpts from numerous depositions, a reply separate statement, and objections to Williams's evidence.

Williams filed an objection to Fox's reply separate statement and additional evidence. He argued that Fox's submission of a 296-page supplemental separate statement in reply was improper and should be disregarded, along with the new facts submitted in reply, including the reply Morales declaration and exhibits thereto, the wage chart, and additional deposition excerpts. Fox filed a written response stating that it had not submitted new evidence but rather responses to plaintiff's evidence.

### D. *Ruling*

The court heard argument on August 27, 2020. The court first addressed the evidentiary objections on the record. With respect to Williams's objection regarding Fox's new evidence on reply, the court sustained the objection "to the extent that it's offered for truth as far as what Manos considered." The court overruled the remainder of Williams's objections to Fox's evidence. The court sustained several of Fox's objections to Williams's evidence; we discuss those relevant to this appeal further below. Following argument by the parties, the court took

14

the motion under submission.

The court issued its order on September 4, 2020, granting the motion. First, the court reiterated that it had not considered any new evidence submitted by Fox with its reply. Second, the court found that Fox "failed to meet its burden of establishing that plaintiff will be unable to obtain evidence to establish a prima facie case." The court noted that Fox relied on the absence of age-related comments to Williams and the fact that Williams did not know the bases for the decisions by Cofer and Manos, and concluded that the absence of such evidence was insufficient for Fox to carry its burden to show that Williams could not obtain evidence to establish a prima facie case.

Third, the court found that Fox "met its burden of show[ing] that it had legitimate business reasons for taking finishing editors off the schedule that were unrelated to their age." As such, the burden shifted to Williams to establish a triable issue of pretext. The court noted that Williams's evidence showed that Way, a younger, fill-in finishing editor, was regularly scheduled to work two days per week, the same number of shifts assigned to Thannum, who was about the same age as Williams. Although Williams claimed that Way received up to five shifts per week, the court found that this occurred only when he was filling in for absent editors, and that Williams "also would have been considered for finishing editor work on a fill-in basis" going forward. Thus, the court found that Williams "has not been able to rebut defendant's legitimate business reason for removing him from the regular schedule. Plaintiff has not been able to point to evidence that raises a rational inference that intentional discrimination occurred." The court granted summary adjudication on both causes of action as to the issue of pretext,

15

and accordingly granted summary judgment for Fox.

The court entered judgment in favor of Fox. Williams timely appealed.

## DISCUSSION

### I. Legal Standards

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (§ 437c, subd. (p)(2).) "[W]e must view the evidence in a light favorable to plaintiff as the losing party, liberally construing [his or] her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) We accept as true both the facts shown by the losing party's evidence and reasonable inferences from that evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856.)

Summary judgment is appropriate only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at pp. 850, 856.)

16

An employee alleging age discrimination under state or federal law must be over 40 years old and must "ultimately prove that [an] adverse employment action taken was based on his or her age." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1002 (*Hersant*); accord, *Guz, supra*, 24 Cal.4th at pp. 354–355.) "Since direct evidence of such motivation is seldom available, the courts use a system of shifting burdens as an aid to the presentation and resolution of age discrimination cases." (*Hersant, supra*, at p. 1002.)

An employer may meet its initial burden in moving for summary judgment or adjudication of an employment discrimination claim by presenting evidence that one or more elements of the plaintiff's prima facie case is lacking, or the employer acted for a legitimate, nondiscriminatory reason. (*Zamora v. Security Industrial Specialists, Inc*. (2021) 71 Cal.App.5th 1, 32; *Husman v. Toyota Motor Credit Corp*. (2017) 12 Cal.App.5th 1168, 1181; *Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1158 (*Featherstone*).) The elements of a prima facie case generally include "evidence that (1) [plaintiff] was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355.) A legitimate, nondiscriminatory reason is one that is unrelated to the prohibited bias and, if true, would preclude a finding of discrimination or retaliation. (*Id*. at p. 358.) "[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the

17

objective soundness of an employer's proffered reasons supports their credibility . . ., the ultimate issue is simply whether the employer acted with a motive to discriminate illegally." (*Ibid*.)

If the employer satisfies its initial burden, the burden shifts to the plaintiff to present evidence creating a triable issue of fact showing the employer's stated reason was a pretext for unlawful animus. (*Husman v. Toyota Motor Credit Corp., supra*, 12 Cal.App.5th at p. 1182; *Featherstone, supra*, 10 Cal.App.5th at pp. 1158-1159.) The plaintiff's evidence must be sufficient to support a reasonable inference that discrimination was a substantial motivating factor in the decision. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232; *Guz, supra*, 24 Cal.4th at pp. 353, 357.) The stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be in order to create a reasonable inference of a discriminatory motive. (*Guz, supra*, 24 Cal.4th at p. 362 & fn. 25.)

## II.    Analysis

### A.    *Ruling on Objections*

We first turn to the trial court's evidentiary rulings, four of which Williams challenges on appeal. We review the trial court's rulings on evidentiary objections for abuse of discretion. (See *Walker v. Countrywide Home Loans, Inc*. (2002) 98 Cal.App.4th 1158, 1169, citing *People ex rel. Lockyer v. Sun Pacific Farming Co*. (2000) 77 Cal.App.4th 619, 639–640.) Here, we conclude that the trial court did not abuse its discretion in sustaining Fox's objections to the evidence.

Williams challenges Fox's objection number 11 regarding his statement in his declaration that "at various times during the last few years I was at Fox, I heard Steve DiPietro . . . state that

18

one of my colleagues, [Ware], was the slowest finishing editor." Fox objected on the grounds of hearsay. The trial court sustained the objection without discussion.

Williams argues DiPietro's statement was an authorized admission and therefore admissible pursuant to Evidence Code sections 1220 and 1222.[8] Evidence Code section 1222, which provides an exception to the hearsay rule for authorized admissions, states, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement; and [¶] (b) The evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

DiPietro's statement was admissible as an authorized admission only if Williams showed, by admissible evidence, that DiPietro was authorized to speak for Fox when he told Williams that Ware was the slowest editor. (*O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 570 (*O'Mary*); see also *Bowser v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 613 ["A statement is 'admissible as an authorized admission . . . only . . . where a proper foundation has been laid as to the declarant's authorization to speak on behalf of the party against whom the statement is offered.'"].)

---

8       Although Williams cites to Evidence Code section 1221 (adoptive admission) in his opening brief, from the substance of his argument it is clear that he intended to cite to section 1222 (authorized admission).

Determining whether an employee has the authority to make a statement "requires an examination of the nature of the employee's usual and customary authority, the nature of the statement in relation to that authority, and the particular relevance or purpose of the statement." (*O'Mary, supra*, at p. 570.)

Apart from contending that "it is obvious" that DiPietro qualified as someone with authority to speak on behalf of Fox, Williams fails to cite to any authority supporting his position. Moreover, he does not cite to any facts in the record establishing such authority, nor does his declaration offer sufficient information about the context in which the statement was made to support his claim that it was made within the scope of DiPietro's purported authority. As Fox points out, Williams did not testify to this statement at his deposition and did not ask DiPietro about it at his deposition, despite DiPietro's contrary deposition testimony that Williams was the slowest. Under these circumstances, we find no abuse of discretion in the trial court's conclusion that the evidence was inadmissible hearsay.

We also reject Williams's alternative contention that the statement was admissible under Evidence Code section 1235. That section permits admission of evidence of a statement "made by a witness" where the "statement is inconsistent with his testimony at the hearing." The evidence must also be offered in compliance with Section 770, which requires the witness to be confronted with the inconsistent statement while testifying in order "to give him an opportunity to explain or to deny the statement." (Evid. Code, §§ 770, 1235.) The statement by DiPietro at issue, recounted by Williams in his declaration, does not satisfy these requirements, as it was not offered to impeach

DiPietro's testimony at a hearing, nor was he given an opportunity to explain or deny it.

Williams also challenges the trial court's rulings on two of Fox's objections to portions of Bloom's declaration. In objection number 15, Fox objected to Bloom's statement that during the time she worked with Williams, she "found him to be very conscientious in his work at all times, extremely dedicated to creating high quality, error free work." In objection number 16, Fox cited Bloom's statement that Williams "had an excellent attitude toward his work and was someone who could always be counted on to accommodate any requests made of him by management." Fox objected that the statements lacked foundation, and were speculative, conclusory, and irrelevant. The court sustained objection number 15 on the grounds of relevance and objection number 16 without comment.

Williams argues that Bloom's statements were relevant to counter Fox's claim that Williams exhibited a poor work ethic. We find no abuse of discretion in the trial court's ruling to the contrary. Bloom did not offer testimony regarding Fox's specific claim that Williams often arrived to work late and seemed eager to leave. Similarly, her testimony did not address Williams's speed as a finishing editor. As such, her general observations regarding his conscientiousness were irrelevant. Moreover, Bloom's statement that Williams was focused on "error-free work" echoes other evidence offered by *both* Williams and Fox, as the latter argued that the former's focus on quality often led to deficiencies in speed. As such, the trial court was within its discretion to exclude the evidence.

We similarly conclude there was no error in sustaining Fox's objection number 24, regarding Morales's deposition

testimony that a document referring to "$85 hr" addressed the average rate for finishing editors. Fox objected that this was irrelevant because Morales submitted an errata to his deposition "explaining that the '$85.00' per hour rate was an estimate used for forecasting, not the average of all finishing editor rates." The court sustained the objection without comment. Williams contends that the evidence was relevant to his claim that he was a highly paid editor and therefore a top performer, and that Morales's errata did not change that conclusion. As we discuss further below, the fact that Williams was paid above the average rate for finishing editors, even if true, does not demonstrate that Fox believed he was performing above his peers. Thus, Morales's testimony regarding the average pay rate is irrelevant to the issue of pretext and the court was within its discretion to exclude it.

### B. *No Triable Issue of Pretext*

We next turn to the merits of Fox's summary judgment motion. The trial court found that Fox had not met its initial burden to show that Williams could not establish a prima facie case of discrimination. Conversely, the court concluded that Fox had presented evidence that it had a legitimate, nondiscriminatory reason for reducing and then eliminating Williams's shifts. Williams does not dispute Fox's evidence that the overall decision to cut shifts in 2017 and 2018 was motivated by its mandate to reduce the budget of the promo department. He contends, however, that Fox's reason for selecting *him* (and Stock-Hendel) was discriminatory. (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1731–1732 [employer met its burden by producing evidence that an employee was terminated as part of a company-wide reduction in force as a

22

result of adverse economic conditions].)  Thus, the burden shifts to Williams to demonstrate a triable issue of fact with "'substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.'"" (*Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 577.)

Williams asserts that he made this showing.  He argues that he presented evidence contradicting Fox's claims that he was the slowest editor with a poor work ethic, and further demonstrated Fox's discriminatory intent with the fact that it targeted only the three oldest editors (Williams, Stock-Hendel, and Thannum) for shift reductions.  We are not persuaded that Williams has met his burden to produce substantial evidence to defeat summary judgment.

Williams argues that Fox's claim that he was the slowest finishing editor, and was selected for reduction as a result, is pretextual.  However, Fox presented evidence from its two decision makers, Cofer and Manos, that they considered Williams to be the slowest of the editors and cut his shifts on that basis.  Producer DiPietro and multiple co-workers also testified that Williams was commonly regarded as the slowest of the group.

Williams failed to meaningfully dispute this evidence; indeed, his testimony supports it.  Williams testified several times during his deposition that he was meticulous, a perfectionist, and prided himself on the quality of his work.  These assessments were echoed by other editors as well as the co-worker declarations Williams presented.  Williams also acknowledged that these traits were not always appreciated by

23

his supervisors at Fox and that in recent years he had seen Fox shift its focus from quality to quantity of work. Williams further admitted that he was aware of times where producers felt he needed to work more quickly and believed he had been spoken to about the issue. This testimony belies Williams's contention that Fox fabricated the claim of slowness after terminating him and that no one at Fox ever mentioned the issue to him.

It is well-established that "a party cannot create an issue of fact by a declaration which contradicts his prior discovery responses." (*Shin v. Ahn* (2007) 42 Cal.4th 482, 500, fn. 12; see also *Foroudi v. The Aerospace Corp.* (2020) 57 Cal.App.5th 992, 1007 [an employee's "subjective beliefs . . . do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations"].) In determining whether any triable issue of material fact exists, the trial court may give "great weight" to admissions made in discovery and "disregard contradictory and self-serving affidavits of the party." (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451.) Thus, Williams cannot create a triable issue of fact by pointing to his statement in his declaration that he was never told about any issues with his speed, where that statement is contrary to his prior testimony. (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21, [where a declaration submitted in opposition to a motion for summary judgment motion clearly contradicts the declarant's earlier deposition testimony, the court may disregard the declaration and "'conclude there is no substantial evidence of the existence of a triable issue of fact'"].)

With respect to the complaints regarding his work ethic, Williams points to the fact that Cofer, Manos, and DiPietro made identical, vague statements in their declarations regarding his

24

arriving to work late and seeming "eager" to leave as evidence that this was not a real issue. In the absence of other evidence, these statements do not strongly support Fox's contention that Williams's perceived poor work ethic was a basis to select him for shift reduction. However, the declarants also testified at their depositions with additional details regarding this issue, such as DiPietro's testimony that Williams arrived between five and 20 minutes late "a lot." Other editors also testified to this issue, and Williams himself admitted he was "occasionally" late to work. Williams presented no evidence to raise a triable issue on this point. Further, his evidence that he was perceived to be an "excellent" editor by some former supervisors and co-workers does not meet his burden, where none of those declarants were the decision-makers here, nor did any of them testify as to his timeliness.

Williams relies heavily on the fact that he was never counseled or reprimanded about his purported problems with speed and work ethic, despite Fox's policy and practice to address such issues with editors through Morales, as evidence that these were not actual issues. But Fox's evidence established that Williams was not chosen for shift reduction in 2017 and 2018 because he was a poor employee or that his issues rose to the level of problems needing formal correction; rather, Fox presented substantial evidence that it chose Williams because he was the slowest *of the finishing editor group.*

Finally, Williams argues that he can establish pretext by showing that Fox targeted only the three oldest editors. This claim is not supported by the record. In the 2017 reduction, Fox cut shifts from four regular finishing editors, ranging in age from 55 to 66. At that time, the evidence shows that Fox increased the

25

number of shifts for one of the fill-in editors, Way (age 45), from one to two per week, but also cut the same number of shifts from the other fill-in editor, Reichlin (age 54), from one to zero. In 2018, Fox eliminated the shifts of two editors, Stock-Hendel and Williams, the first and third oldest editors, respectively, but retained the second-oldest, Thannum (age 65), as well as the fourth-oldest, Frederick (age 60). Fox did not increase shifts for any editors at that time. Williams contends that fill-in editor Way later had his shifts increased to between three and five per week. However, the evidence shows that Way remained at an average of two shifts per week, working more only as a fill-in to cover absences or vacations, shifts for which Williams also was eligible. Thus, Williams failed to present evidence to support his claim that Fox gave his shifts to a younger editor.

Williams also claimed that he and Stock-Hendel were the highest paid editors[9] and therefore the best performers. But he provided no evidence linking performance with pay. Instead, Fox presented evidence that the pay rate was established under the CBA and raises were given on an annual basis, rather than based on an evaluation of an editor's performance.

Accordingly, we conclude that Williams failed to establish evidence of pretext and the trial court did not err in granting Fox's motion for summary judgment.

---

[9]    We note that Fox disputed this claim and provided evidence with its reply suggesting that one of the youngest editors earned the highest hourly rate among the editors. However, the trial court sustained Williams' objection to this belated evidence, a ruling Fox has not appealed.

**DISPOSITION**

The judgment is affirmed.  Fox is entitled to its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, ACTING P.J.

We concur:

CURREY, J.

SCADUTO, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27