Filed 2/24/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUCHIN I. LIN, | B314162 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV23260) |
| v. | |
| KAISER FOUNDATION HOSPITALS, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of
Los Angeles County, Barbara A. Meiers, Judge.  Reversed
and remanded.

Gusdorff Law and Janet Gusdorff; The Rager Law Firm, Jeffrey A. Rager and James Y. Yoon, for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza and Zena Jacobsen, for Defendant and Respondent.

_____

## INTRODUCTION

Appellant Suchin Lin appeals from the trial court's grant of summary judgment in favor of her former employer, respondent Kaiser Foundation Hospitals (Kaiser). Because the record discloses triable issues of fact on Lin's claims, all of which relate to disability discrimination, we reverse the judgment.

As part of a round of employee layoffs, Kaiser planned, at least tentatively, to terminate Lin before Lin became disabled. Kaiser's plan to terminate Lin before she became disabled, by itself, was (of course) not discrimination against Lin because of a disability. But Kaiser did not complete its layoff plans—or, a reasonable jury could find, make its final determination to terminate Lin—until after Lin had become disabled. On the record here, there was evidence from which a reasonable jury could conclude that Kaiser's ultimate decision to terminate Lin was motivated, at least in substantial part, by concerns Kaiser had about Lin's disability. That allows Lin's complaint to survive summary judgment.

# FACTUAL AND PROCEDURAL BACKGROUND[1]
## *A. Lin Receives Positive Performance Ratings Before Her Disability*

In June 1999, Kaiser hired Lin as a data management associate. From 1999 to 2016, Lin was on several occasions promoted or transferred to a different position, culminating in a position as an IT engineer. During this period, Lin's managers evaluated her performance positively.

In May 2017, Lin was transferred to a position as a Software Quality Assurance Associate Engineer in the Innovation and Transformation (I&T) department, one of eight departments within Kaiser's Technology Risk Organization (TRO). Lin had four teammates in the I&T department, each of whom was more experienced than Lin in quality assurance. Lin and her teammates were directly supervised by Sridhar Manne. Manne, in turn, was supervised by Douglas Monroe, who reported to I&T executive director Wilson Henriquez.

In March 2018, Manne completed written 2017 performance evaluations for the I&T department, giving Lin and each of her teammates the same overall rating of "Successful Performance." Manne rated Lin's performance as "Excellent" in several subcategories, including those that encompassed meeting "timeframes" and operating

---

[1] Our description of the record construes the facts in the light most favorable to Lin, the party opposing summary judgment. (See *Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 877.)

3

"efficiently."  Later in 2018, Manne conducted Lin's mid-year evaluation, again rating her performance as successful.

### B. Lin Is Selected, Before She Becomes Disabled, for a Reduction in Force (RIF)

In December 2018, Kaiser began to plan to lay off certain employees, for economic reasons.  Specifically, on December 12, 2018, TRO senior director Mark Lopez circulated an email stating that "potential reductions" were required to meet 2019 budget targets and asking TRO directors to select employees to be included on a list for layoffs to be completed as part of a "Reduction in Force" or "RIF" to help Kaiser meet budgetary goals for 2019.

I&T executive director Henriquez declared that on or around December 18, 2018, he made the decision to eliminate Lin's position, explaining: "I selected Lin based on discussions I had had earlier with Douglas Monroe and Sridhar Manne about Lin's performance issues in 2018, that she was not getting up to speed as quickly as expected and was still struggling in performing her duties as a Quality Assurance tester."  As discussed further below, however, there is at least ambiguity in the record about whether these conversations actually took place.  The contemporaneous documentary record does not reflect these concerns about Lin's performance.

### C. Lin Becomes Disabled and Makes Initial Requests for Accommodation

On January 7, 2019, Lin fell in her workplace and suffered an injury to her left shoulder. The same day, a doctor issued a work status report placing Lin on modified duty through January 11, with restrictions requiring Lin to use a sling and to limit use of her left arm. Lin sent the work status report to Manne on January 8, and on January 9 informed Manne that she could not move her left arm "at all" and that she had an upcoming appointment to be evaluated for surgery.

On January 21, 2019, Lin sent Manne a doctor's report placing her on modified duty through February 22, with new restrictions limiting use of her left arm and requiring Lin to attend medical and physical therapy visits. The next day (January 22), a workers' compensation claims examiner asked Manne by email whether he would be able to accommodate these restrictions. Manne responded: "Yes I would be able to accommodate the modified duty. [¶] Suchin [Lin] is on approved [non-disability-related] time off from today thru Feb 12th. [¶] Once she is back, I will be assigning her with lighter tasks." Lin declared that Manne never assigned her lighter tasks or discussed the possibility of modifying her assignments with her.

5

### D. Lin's Supervisor Negatively Evaluates Lin's Performance in Connection with the RIF

On January 29, 2019, after Lin had suffered her injury, Manne, Lin's supervisor, discussed Lin's performance with human resources business partner Kimberly West. According to West's handwritten notes from their discussion, Manne identified an issue with the quality of Lin's work, at least in part due to Lin's "slow delivery." West also noted that Lin was on modified duty, and wrote beneath this note: "slower typing?" Lin testified at her deposition that her injury caused her to type more slowly.

The same day (January 29, 2019), I&T executive director Henriquez emailed Manne, asking: "Which [I&T] team members have a good analytical skill set? Which team members have a good communication skill set? Which team members have high technical acumen? Which team members show good time management and organization? [¶] It might be easier if you look at the questions above and tell me how you would rate each member from a 1 to a 4." Manne responded with an attachment setting forth the requested ratings for Lin and her four teammates in five "competencies" (process improvement, analytical skills, communication, technical acumen, and organization). Manne gave Lin an aggregate rating of nine out of 20, while giving each of her teammates a higher rating of 16 or above. Henriquez testified at his deposition regarding his reason for requesting this performance information: "It was probably requested by me—from me to make sure that I had—that

there was a good handle in terms of the folks in the group and to make sure probably to compare and make sure that it wasn't an unjust termination—not termination, layoff . . . ."

Similar numerical ratings of employee competencies were prepared in at least three other TRO departments. West declared that these ratings were prepared and collected "as part of Human Resources' due diligence processes in connection with the 2019 TRO reduction in force."

On January 31, 2019, Kaiser circulated an updated RIF list, which had been narrowed from 31 to 25 employees but still included Lin. Comments concerning the six employees removed from the list indicated that two were removed because they had resigned, two because contractors had been terminated in their stead, one because "contractor spend reduced," and one because "M&A resource."

### E. Lin's Supervisor Increases His Criticisms of Lin's Performance

On February 22, 2019, Lin's modified duty was extended by her doctor through March 25, subject to the same restrictions limiting use of her left arm and requiring her to attend medical and physical therapy visits. On February 27, Manne met with Lin to discuss her performance. In a February 28 email memorializing the discussion, Manne stated that Lin's "unavailability" had occasionally forced her teammates to complete tasks for her and that Lin's "pace of execution needs improvement."

Manne placed Lin on an "action plan" requiring her, inter alia, to "manage [her] tasks within a reasonable time." Manne warned that she may be terminated if she failed to show improvement.

Lin testified at her deposition about this February 2019 meeting with Manne. She testified that in the course of complaining that Lin's teammates had completed tasks for her and that she needed to work at a faster pace, "[Manne] said, you know, why are you seeing the doctors." Lin told Manne that her injury caused her pain and limited her ability to type, and that she needed to attend medical and physical therapy visits two or three times per week as instructed by her doctor. Lin further told Manne that her health prevented her from working overtime, and that she "need[ed] help." Nevertheless, Manne pressured her to work unpaid overtime off the clock.

In the wake of this February 2019 meeting, Lin sent written complaints to West in human resources that Manne had, inter alia, asked her to work off the clock and created a hostile environment, causing her such emotional distress that she had been unable to sleep. At West's suggestion, Lin contacted Kaiser's employee assistance program to discuss her emotional distress, ultimately leading to her referral to a psychiatrist.

On March 8, 2019, Manne met with Lin to discuss and complete her 2018 year-end performance evaluation. Although Manne again rated Lin's overall performance as successful, he wrote that she was at the "lower end" of

8

successful performance and rated her performance in several subcategories as needing improvement. Soon thereafter, Lin sent Manne a doctor's report placing her on medical leave, which was later extended through May 19.

### F. Lin's Termination and Complaint

In March 2019, Kaiser circulated two more drafts of the RIF list, which was reduced first from 25 to 20 employees and finally to 17, still including Lin. On April 16, Kaiser provided notice of the RIF to the 16 employees on the final list other than Lin, who remained on medical leave. On April 24, Kaiser notified Lin that her position had been eliminated and that her employment would be terminated effective June 23.

Within weeks of her termination, Lin filed her complaint against Kaiser in this action. Her operative, first amended complaint contained the following FEHA causes of action: (1) disability discrimination; (2) retaliation for requesting disability accommodations and opposing practices forbidden under FEHA; (3) failure to prevent discrimination and retaliation; (4) failure to accommodate a disability; and (5) failure to engage in an interactive process regarding disability accommodations. The complaint also contained causes of action for wrongful termination in violation of public policy and intentional infliction of emotional distress (IIED).

### G. Kaiser's Motion for Summary Judgment

In June 2020, Kaiser moved for summary judgment or, in the alternative, summary adjudication. Kaiser argued that it was entitled to summary adjudication of Lin's disability discrimination and retaliation claims because Henriquez had made the decision to eliminate Lin's position in the RIF in December 2018, before Lin sustained her disability. For the same reasons, Kaiser argued that it was entitled to summary adjudication of Lin's "derivative" claims for failure to prevent discrimination and retaliation, wrongful termination, and IIED. Finally, with respect to Lin's claims for failure to accommodate her disability and to engage in an interactive process, Kaiser argued the claims failed as a matter of law because Kaiser had granted every accommodation Lin requested, i.e., modified duty (as prescribed by her doctors) and medical leave.

Lin opposed the motion. She did not dispute that her name was selected for the initial RIF list in December 2018. But she argued that the evidence showed this "proposed" list was "subject to further review," as reflected in the list's gradual reduction from 31 employees to the 17 who were ultimately laid off. She further argued that her ultimate termination was a result of Henriquez's reliance on Manne's post-disability assessment of her, particularly on Manne's January 29, 2019 email to Henriquez rating her performance much lower than that of her teammates. She argued that Manne's negative ratings were based on her disability and/or her requests for accommodations, as evidenced by the

disparity in his evaluations of her performance before and after these events, and by his criticism of performance issues "emanating from her disability." Finally, she argued that because Manne never assigned her lighter tasks—as he said he would—or discussed other possible accommodations to help her overcome her disability-related pace issues, she had raised triable issues of material fact on her accommodation claims.

### H. The Trial Court's Hearing and Ruling

In April 2021, the trial court held a hearing on Kaiser's motion for summary judgment. In May 2021, the court issued a minute order granting Kaiser's motion for summary judgment in its entirety. The court explained: "[T]he court finds that the plaintiff has failed to produce facts, as opposed to opinions and speculation, that the defendant terminated her employment for any reasons other than those which it has articulated relating to budget considerations and [the RIF]. The undisputed evidence is . . . that this decision to terminate the plaintiff was made before her disability was made known to the defendant." In response to Lin's argument that post-disability discussions of her performance influenced Kaiser's decision to terminate her, the court stated, in relevant part: "The record is clear that these post-decision-to-fire- discussions also occurred with regard to all of the other employees who were also being let go as a part of the same group of 'firings,' and . . . simply as a 'pro forma' part of [Kaiser's] ongoing process of internally documenting

11

and processing [the initial RIF selections].” With respect to Lin’s claims for failure to accommodate her disability and to engage in an interactive process, the court noted that “it was undisputed that all accommodations sought were granted.”

The court subsequently entered judgment in Kaiser’s favor. Lin timely appealed.

## DISCUSSION

Lin contends that the trial court erred in granting Kaiser summary judgment on all her claims. For the reasons discussed below, we agree and reverse the judgment.

### A. Standard of Review

“On appeal after a motion for summary judgment has been granted, we review the record de novo . . . . [W]e determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff’s case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law.” (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) We view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party’s favor. (*Weiss v. People ex rel. Department of Transportation* (2020) 9 Cal.5th 840, 864; see also Code Civ. Proc., § 437c, subd. (c).)

12

### B. FEHA Disability Discrimination
### 1. Disability Discrimination Standards

FEHA prohibits an employer from discharging any person from employment—or otherwise discriminating against the person in terms, conditions, or privileges of employment—because of the person's disability. (Gov. Code, § 12940, subd. (a).)

Three aspects of FEHA are particularly significant here. First, in situations where the evidence of disability discrimination is circumstantial, "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . based on a theory of disparate treatment." (*Guz, supra*, 24 Cal.4th at 354, citing *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*).)[2]

The *McDonnell Douglas* test "places on the plaintiff the initial burden to establish a prima facie case of discrimination," requiring evidence that: (1) the plaintiff was a member of a protected class; (2) she was performing competently in the position she held; (3) she suffered an adverse employment action such as termination; and (4)

---

[2]     Lin contends that because she produced direct and not merely circumstantial evidence of disability discrimination, the *McDonnell Douglas* test does not apply, and her burden on summary judgment is less onerous. We need not and do not address this contention, because we conclude that Lin has raised triable issues of material fact on her discrimination claim even under the more burdensome *McDonnell Douglas* test.

some other circumstance suggests the employer acted on a discriminatory motive.  (*Guz, supra*, 24 Cal.4th at 354-355.) The burden then shifts to the employer to produce admissible evidence of one or more legitimate, nondiscriminatory reasons for its adverse employment action.  (*Id.* at 355-356.)  Finally, the burden shifts back to the plaintiff "to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive."  (*Id.* at 356.)  "Invocation of a right to downsize does not resolve whether the employer had a discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release."  (*Id.* at 358.)

Second, it is not ordinarily necessary for a disabled employee to show that a disability was the *sole* reason for a termination, or that the termination would not have happened but for the disability.  Instead, when a plaintiff-employee advances a "mixed motive" theory (i.e., a theory that an employer had both legitimate and discriminatory motives for a termination), the plaintiff must show only that her disability was a "substantial motivating factor" in the challenged employment action.  (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 229-232, 241 (*Harris*).) "[D]iscrimination, though not a 'but for' cause of an adverse employment action (because the employer can show it would have taken the same action in any event), might nonetheless be found to be a substantial motivating factor . . . ."  (*Id.* at

14

226.)[3] Thus, "[i]f triable issues of material fact exist [as to] whether discrimination was a substantial motivating reason for the employer's adverse employment action, even if the employer's professed legitimate reason has not been disputed, the FEHA claim is not properly resolved on summary judgment." (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1186.)

Third, under the so-called "'cat's paw'" doctrine, a plaintiff "need not demonstrate that every individual who participated in the [challenged employment action] shared discriminatory animus in order to defeat a summary judgment motion. . . . [S]howing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.)

---

[3] To be clear, if an employer can persuade the trier of fact that it would have made the same decision to terminate an employee regardless of a discriminatory motive, the employee-plaintiff is not ordinarily entitled to collect monetary damages, and is limited to obtaining injunctive and declaratory relief and attorneys' fees. (*Harris*, *supra*, 56 Cal.4th at 232-235.) We express no opinion as to whether Kaiser can make such a showing at trial, or what such a showing would mean for the ultimate relief available to Lin in this action.

## 2. Analysis

Applied here, these standards compel reversal of the trial court's summary adjudication of Lin's FEHA disability discrimination claim.

There is no serious dispute that Lin met her burden at the first stage of the *McDonnell Douglas* test, and that Kaiser met its burden at the second stage. Kaiser does not contend (and the trial court did not find) that Lin failed to meet her prima facie burden. Equally, Kaiser is certainly correct that its decision to place Lin on the initial RIF list for termination in December 2018—before Lin became disabled—could not have been unlawful disability discrimination or a pretext therefor.

But Kaiser's placement of Lin on the December 2018 RIF list is not, by itself, dispositive. Kaiser did not actually eliminate Lin's position, provide final notice of the RIF list, and ultimately give Lin notice of termination until April 2019—months after Kaiser became aware of Lin's disability. If Lin can show by competent evidence that between December 2018 and April 2019 disability discrimination *became* at least a substantial motivating factor in Lin's termination, then the fact that she was originally placed on the list for a layoff is not decisive. The critical question is whether the summary judgment record, construed in Lin's favor, rationally supports both of the following inferences: (a) Kaiser's December 2018 selection of Lin for the RIF list was tentative, not final; and (b) Kaiser's ultimate decision to keep Lin on the RIF list and to terminate her employment

was based, at least in substantial part, on Lin's disability. For the reasons discussed below, we conclude that the record rationally supports both of those inferences. That means Kaiser was not entitled to summary judgment on Lin's FEHA disability discrimination claim.

### a. A jury reasonably could find that Lin's December 2018 selection for the RIF was tentative

The record is clear that the December 2018 RIF list was not set in stone. Between December 2018 and March 2019, Kaiser circulated several progressively narrower drafts of the RIF list. As Kaiser concedes: "There is no dispute that the December 18, 2018 RIF list contained 31 names, and ultimately only 17 employees were laid off in April 2019." Kaiser further concedes that in other departments within TRO (which encompassed Lin's I&T department), Kaiser averted layoffs of employees targeted by its initial RIF plan "'because another way was found to cut costs,'" such as terminating contractors instead of the initially selected employees. In Lin's own I&T department, Kaiser's documents note that considerable savings were predicted to be achieved by methods such as "[r]eduction of Risk Engine support"; "[r]eduction of CEB Insights and Cloud Security Alliance"; and "[r]eduction in travel, training and additional savings." On this record, drawing all reasonable inferences in Lin's favor, a jury rationally could find that even after Kaiser selected Lin for the initial RIF

17

list in December 2018, it could have averted Lin's termination by finding other means to meet I&T's budget target.

Even more important, evidence in the record suggests that after Lin became disabled in January 2019, Kaiser considered factors directly related to employee performance in deciding whether to maintain employees on the RIF list. On January 29, 2019, in connection with his preparation of plans for the RIF, I&T executive director Henriquez asked Lin's direct supervisor Manne for detailed ratings of employee performance among the members of Lin's team: "Which team members have a good analytical skill set? Which team members have a good communication skill set? Which team members have high technical acumen? Which team members show good time management and organization?" Henriquez admitted at his deposition that in 2019 he asked for, obtained, and relied on Manne's opinion concerning Lin "in terms of the reduction in force." Moreover, Henriquez testified that his reason for seeking this performance information was to "compare" the members of the group and to ensure "it wasn't an unjust termination [or layoff]." A reasonable jury could infer from Henriquez's concern about the layoff's fairness that had Manne rated Lin's performance in a manner suggesting her layoff would be "unjust," Henriquez would have sought to avert Lin's layoff, and cost-cut in a different area.

The reasonableness of this inference is further supported by ambiguity in the record regarding the reasons

for Lin's initial selection for the RIF list in December 2018. Through a declaration from Henriquez—whom Kaiser characterizes as "the sole decisionmaker"—Kaiser sought to establish that Henriquez selected Lin for the initial RIF list in reliance on discussions with Manne and Manne's supervisor Monroe about Lin's relatively poor performance prior to 2019. But Monroe failed to recall these alleged performance discussions at his deposition, and Kaiser failed to produce any deposition testimony or other evidence corroborating Henriquez's declaration that these discussions occurred. Kaiser's failure to produce a firm record explaining Lin's initial selection for the RIF list helps to support an inference that when Henriquez solicited and received Manne's evaluation of Lin's performance on January 29, 2019, he was open to removing Lin from the RIF list on the basis of that information.

In response, Kaiser argues—as the trial court found—that any efforts it took to assess employee performance after December 2018 were entirely "pro forma" and lacked any causal relation to Lin's remaining on the RIF list. Kaiser emphasizes that to the extent the record reveals Kaiser's stated reasons for removing 14 employees from the initial RIF list, such as the termination of contractors instead, those reasons were unrelated to the employees' performance. Kaiser also cites human resources executive West's declaration that the collection of performance information was simply a function of "due diligence," and Henriquez's deposition testimony characterizing his January 2019

19

request for such information from Manne as a mere "formality."

While these facts support inferences in Kaiser's favor, they are not determinative of the issues on this appeal. In this posture, we are required to draw all competing reasonable inferences in Lin's favor. (See *Weiss v. People ex rel. Department of Transportation, supra*, 9 Cal.5th at 864; Code Civ. Proc., § 437c, subd. (c).) A reasonable jury could readily conclude that when Kaiser, in 2019, collected information about the performance of its employees in connection with its RIF plan, Kaiser did so for a reason. It is reasonable to infer that Kaiser substantially relied on the information about employee performance it collected in making decisions about the RIF. As noted, Henriquez—the executive director of Lin's department—specifically testified that the reason he collected information in 2019 concerning Lin's performance was to determine whether the layoff would be "unjust." Thus, a jury reasonably could find that Kaiser and Henriquez did not simply collect employee performance information for (unspecified) "pro forma" or "due diligence" reasons, but instead were relying, at least in substantial part, on information about Lin's performance as an employee in deciding whether to proceed with Lin's termination. We turn now to the question whether the jury could find this decision was substantially motivated by Lin's disability.

20

***b. A reasonable jury could find that
Lin's termination was substantially
motivated by her disability***

For Lin's FEHA disability discrimination claim to survive summary judgment, Lin must show facts from which a reasonable jury could conclude that Kaiser's ultimate decision to terminate her employment was motivated in substantial part by her disability. (See *Harris*, *supra*, 56 Cal.4th at 231-232; *Husman v. Toyota Motor Credit Corp.*, *supra*, 12 Cal.App.5th at 1186.) Here, too, we find that the record contains sufficient evidence for Lin to meet her burden.

Before Lin sustained her disability, neither Manne nor any prior supervisor gave her a negative performance evaluation. Throughout Lin's more than 15 years at Kaiser before she joined Manne's team, her supervisors consistently evaluated her performance as successful. Manne, too, gave Lin successful performance ratings on her 2017 and mid-year 2018 performance evaluations. While there is little evidence in the record concerning the performance of Lin's teammates, Manne rated each teammate's performance in 2017 as successful—the same rating he gave Lin.

After Lin's disability, however, Manne judged Lin's performance much more harshly in comparison to that of her teammates. On January 29, 2019 (three weeks after receiving notice of Lin's disability), Manne informed Henriquez that Lin was by far the lowest performer in the I&T department, assigning her an aggregate rating of 9 out

of 20 while rating each of her teammates 16 or above. Manne went on to provide Lin with increased negative feedback when placing her on an action plan in February 2019 and completing her 2018 year-end performance evaluation in March 2019.

A reasonable jury could find that Manne's newly negative evaluation of Lin's performance was substantially motivated by her disability. In the weeks between Lin's injury to her left shoulder on January 7, 2019, and Manne's negative evaluation of Lin to Henriquez on January 29, Manne was informed that Lin's injury limited her use of her left arm (which at one point she could not move "at all"), that she might need surgery, and that she needed to attend regular medical and physical therapy visits. On January 22, when confirming that he could accommodate the restrictions prescribed by Lin's doctors, Manne expressed the intent to assign Lin lighter tasks, supporting a reasonable inference that he believed her disability prevented her from handling her usual workload. On January 29—the same day Manne provided his negative evaluation of Lin to Henriquez—he complained to human resources executive West about Lin's "slow delivery" and (a jury reasonably could infer) her slow typing, which Lin testified was caused by her disability. A month later (on February 27), Manne similarly criticized Lin's "pace of execution" and—according to Lin's testimony, which a jury would be entitled to credit—expressly linked this complaint to her time spent at medical appointments.

Kaiser does not dispute that a reasonable jury could find Manne's disability-related animus affected his negative evaluations of Lin's performance. Nor does it dispute that Manne's negative evaluations were provided to Henriquez, who had decision-making authority over whether Lin would be terminated as part of the RIF. Instead, Kaiser disputes the factual basis for Lin's theory that Henriquez was Manne's "cat's paw," arguing that Lin failed to raise any triable issue regarding whether Henriquez ever reevaluated Lin's initial selection for the RIF. Having rejected that argument above, we now conclude that Lin has raised triable issues on her cat's paw theory. In other words, a reasonable jury could find that Henriquez relied, at least in substantial part, on Manne's negative performance evaluations and on Manne's disability-related animus in deciding that Lin would not be removed from the RIF list and her employment would be terminated. Thus, a reasonable jury could find that Lin's disability was at least a substantial motivating factor for her termination. That is a sufficient finding to subject Kaiser to liability. (*Harris*, *supra*, 56 Cal.4th at 231-232.)

We therefore reverse the trial court's summary adjudication of Lin's disability discrimination claim.

### C. FEHA Retaliation

For similar reasons, we conclude Lin's claim for FEHA retaliation survives summary judgment. FEHA makes it unlawful for an employer to "retaliate or otherwise

discriminate against a person for requesting accommodation [for a disability], *regardless of whether the request was granted.*" (Gov. Code, § 12940, subd. (m)(2), italics added.)

Here, a reasonable jury could find that Kaiser, acting on Manne's retaliatory animus, terminated Lin's employment in substantial part because Manne resented Lin's accommodation requests—even though Kaiser ultimately granted those requests. Lin first requested disability accommodations on January 8, 2019 (the day after her injury), and she requested further accommodations—including regular attendance at medical and physical therapy visits—on January 21. Although Kaiser granted these requests, a jury reasonably could find that Manne was troubled by the need to provide the requested accommodations. This is particularly true given Lin's testimony that Manne later complained of her time spent at medical appointments.

A reasonable jury could also find that Manne's resentment over accommodations affected his negative ratings of Lin in the January 29 performance evaluation. As discussed above, there are triable issues regarding whether Manne's negative ratings, in turn, affected Henriquez's decision to leave Lin on the RIF list and to ultimately terminate her employment. Accordingly, because a reasonable jury could, on this record, find a violation of Government Code section 12940, subdivision (m)(2), we

24

reverse the trial court's summary adjudication of Lin's retaliation claim.[4]

### D. Derivative Claims for Failure to Prevent Prohibited Conduct, Wrongful Termination, and IIED

The parties agree that if we conclude—as we have—that Lin's claims for disability discrimination and retaliation survive summary judgment, we should reach the same conclusion with respect to Lin's "derivative" claims for failure to prevent discrimination or retaliation, wrongful termination in violation of public policy, and IIED. Accordingly, we reverse the trial court's summary adjudication of these claims as well.

### E. Failure to Accommodate Lin's Disability and to Engage in the Interactive Process

Under FEHA, an employer is required "to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (Gov. Code, § 12940, subd. (m)(1).) Relatedly, the employer is required "to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for

---

[4] We need not address Lin's alternative theory in support of her retaliation claim, i.e., that Kaiser retaliated against her for opposing practices forbidden under FEHA. (See Gov. Code, § 12940, subd. (h).)

25

reasonable accommodation by an employee or applicant with a known physical or mental disability . . . ." (Gov. Code, § 12940, subd. (n).) Contrary to Kaiser's contention (which the trial court accepted), it is not necessarily sufficient for an employer merely to grant the employee each accommodation she requests. "'[T]he employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation *or* where the employer is aware that the initial accommodation is failing and further accommodation is needed.'" (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013, italics added.) Put differently, while an employer need not read an employee's mind or provide accommodations of which it is unaware, when an employer *is* aware of a further reasonable accommodation that is needed, the employer has a duty to consider that accommodation even if the employee does not explicitly request it. (See Cal. Code Regs., tit. 2, § 11068, subd. (e) ["An employer or other covered entity is required to consider any and all reasonable accommodations of which it is aware *or* that are brought to its attention by the applicant or employee" (italics added)].)

Applying these standards to the record before us, viewed in the light most favorable to Lin, we conclude that Lin has made a showing sufficient to survive summary judgment. Although Kaiser granted Lin each accommodation she requested, the record contains evidence that through Manne, Kaiser knew of—but failed to discuss

26

or provide—an additional reasonable accommodation that Lin needed, namely assigning Lin "lighter tasks." On January 22, 2019, Manne expressed an intent to provide this very accommodation upon Lin's return from a vacation. When Lin returned in February 2019, however, she was not assigned lighter tasks, but instead was subjected to increased criticism of her performance. In response, Lin told Manne that his performance concerns were linked to her disability and that she "need[ed] help." A jury reasonably could find that by this point, Manne was aware that Lin's initial accommodations were failing and further accommodation was needed. That would trigger Kaiser's duties to engage in the interactive process and to consider any and all reasonable accommodations of which it was aware, including the lighter assignments Manne himself had contemplated. (See *Scotch v. Art Institute of California, supra,* 173 Cal.App.4th at 1013; Cal. Code Regs., tit. 2, § 11068, subd. (e).)[5] Kaiser does not contend that it discharged these duties or that assigning Lin lighter tasks would have been unreasonable.

---

[5] The cases on which Kaiser relies are distinct. (See *Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 739-740 [employee failed to provide employer sufficient information to establish he was disabled, much less to establish his need for accommodations]; *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 444 [employee failed to communicate his disability-related distress to his supervisors, who reasonably relied on his "apparent" ability to "'get the job done'" notwithstanding his disability].)

Accordingly, we reverse the trial court's summary adjudication of Lin's claims for failure to accommodate her disability and to engage in the interactive process.  Because we likewise reverse the court's summary adjudication of Lin's other claims, we reverse the judgment in its entirety.

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.  Lin is awarded her costs on appeal.

**CERTIFIED FOR PUBLICATION**


DAUM, J. [*]


We concur:


COLLINS, J.


CURREY, Acting P.J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.